**SPRINGDALE SCHOOL DISTRICT**

v.

**Sherry GRACE et al.**

**and**

**The Arkansas Department of Education.**

**Civ. No. 80–5017.**

United States District Court,
W. D. Arkansas,
Fayetteville Division.

July 25, 1980.

James M. Roy, Jr., Blair, Cypert, Waters & Roy, Springdale, Ark., for plaintiff.

Stephen M. Sharum, Fort Smith, Ark., for defendants Grace.

Nelwyn L. Davis, Asst. Atty. Gen., Little Rock, Ark., for defendants Arkansas State Dept. of Ed., et al.

MEMORANDUM OPINION

PAUL X WILLIAMS, District Judge.

In this case, the plaintiff, Springdale School District Number 50 of Washington

County, Arkansas, seeks a holding that the appropriate education for Sherry Grace, a handicapped child, is provided at the Arkansas School for the Deaf instead of the Springdale Public School. The defendants, Albert Grace, Joann Grace, individually and as guardian ad litem for Sherry Grace, have counterclaimed seeking an injunction requiring the plaintiff to hire a special teacher qualified to teach Sherry Grace and to institute a summer program to make up the educational deficiencies they contend occurred during the 1979–80 school term while their child attended the Springdale Elementary School.

Subject matter jurisdiction exists under 20 U.S.C. § 1415(e)(2) and (4).

Sherry Grace was born to Albert and Joann Grace on January 19, 1970. The Graces lived in Washington County, Arkansas. During Sherry's early infancy, she suffered from various ear infections and related problems. When she was two years old, her parents discovered that she was profoundly deaf, having either been born deaf or having lost her hearing before she developed speech. Sherry has a 95% loss of hearing which renders her completely deaf for all intents and purposes.

Sherry received no formal education or training in communication before the age of four. When she was four years old, she was enrolled in the Bates Elementary School in Fayetteville, Arkansas, which had a special program for children with hearing impairment. She lived with her parents in Springdale, Arkansas.

The Bates program for the hearing impaired was designed for children who retain some hearing (hard of hearing children) and not for the profoundly deaf. If a person is merely hard of hearing, he can be orally instructed, although amplification may be necessary. A hard of hearing person may more easily be taught lip reading and other skills which are designed to implement the hearing that exists. A person who is profoundly deaf can only visually receive information. If one is profoundly and prelingually deaf, he lacks the concept of language and must not only receive visual instruction, but also must be taught the most rudimentary matters concerning language. Because Sherry Grace is profoundly and prelingually deaf, the Bates program, geared to hard of hearing children, was inadequate and she made little or no progress after two years at the Bates school. Her language level was that of a child of two years and two months.

Unlike other handicaps, profound prelingual deafness renders the person extremely isolated. Hearing humans rely almost exclusively on oral communication until they learn to read and write, and if untrained in sign language, can convey only the simplest ideas through gestures and signals. A profoundly deaf child who has not learned to read usually learns nothing other than those matters which a normal prelingual child of one or two years would know. A profoundly deaf person can effectively communicate with no one when he leaves the presence of one trained in sign language.

Even though Sherry Grace has an above normal intelligence, by the age of six she had learned very little. Her parents had not taken any training in sign language and the Bates program did not provide the visual teaching method required.

When Sherry was six years old, she and her parents moved to Little Rock, Arkansas, so that Sherry could attend the Arkansas School for the Deaf as a day student. The Deaf School accepts only profoundly deaf students and its programs are designed for those persons who can only receive information visually. The School for the Deaf teaches the total communication system, a method of visual communication encompassing signing, fingerspelling, visual clues, touching and mouthing. There were approximately 285 students attending the Arkansas School for the Deaf. Sherry learned some total communication skills and for the first time in her life could communicate with her teachers and her fellow students. The School also urged parents of their students to learn total communication so that they could communicate with their children. Mrs. Joann Grace attended a few classes and learned some sign language; Mr. Albert Grace did not.

Sherry Grace attended the School for the Deaf for three years while living with her parents in Little Rock. While there, she progressed from having a language level of a two-year, two-month old child to being able to read at the 2.5 grade level. Because she was able to communicate with others and participate in the life of the school, Sherry's confidence and social ability also developed.

At the end of Sherry's third school year at the Deaf School, Mr. and Mrs. Grace decided they wanted to move from Little Rock to Springdale, Arkansas. They found Little Rock more expensive and a financial hardship even though they were self-supporting. They also wanted to be near their parents and wanted Sherry to be able to spend more time with her grandparents. When the Graces told the Deaf School of their plans to move to Springdale and to enroll Sherry in the Springdale public school system, Sherry's teachers tried to explain the necessity of keeping Sherry enrolled in the School for the Deaf, even if it involved her becoming a residential student. The school urged that removing Sherry from the Deaf School would not only hinder Sherry's academic progress, but also would isolate her from meaningful social encounters.

The Graces moved to Springdale and enrolled Sherry in the fourth grade at the Springdale Elementary School. The school tested Sherry, and after consultation with her parents, formulated an individual educational plan (IEP).

The IEP developed by the Springdale school noted that Sherry should be taught by a certified teacher of the deaf, one who employs total communication and who could teach it to Sherry. The IEP also reflected that Sherry lacked the skills in reading, spelling and arithmetic of the average fourth grader, and her general knowledge was below level. The school's IEP stated that the Arkansas School for the Deaf in Little Rock was the proper school to meet Sherry's special needs.

The Graces disputed that Sherry should be sent to the Arkansas School for the Deaf, but otherwise agreed with the school's assessment of Sherry's needs. A temporary IEP was developed which governed Sherry's education at Springdale. Under the temporary IEP, Sherry remained in the class with non-handicapped fourth graders, but would go to the Resource Room for approximately two hours each day to receive special instruction and speech therapy.

Because Mr. and Mrs. Grace disagreed with the original IEP developed by the Springdale school, they sought review. After proper notices and pre-hearing conferences, a due process hearing was held on November 7, 1979. The hearing officer held that the Springdale School District was wrong and that the Arkansas School for the Deaf was not the most appropriate placement for Sherry. The Springdale School District appealed and the appeals officer affirmed, holding that Sherry Grace should be educated within northwest Arkansas so that she could live with her parents.

In January, 1980, the school began to provide a full-time interpreter for the deaf who was present with Sherry in her classroom, interpreting the teacher's words and Sherry's responses.

In February, 1980, the Springdale school initiated this action seeking review of the appeals officer's decision that Sherry not be sent to the Arkansas School for the Deaf.

The case was advanced on the docket and evidence was tendered to the Court on May 8 and 9, 1980. A transcript of the due process hearing and other administrative matters was filed in this cause.

The Education for All Handicapped Children Act, 20 U.S.C. §§ 1401–1461, establishes a program of financial assistance to States who have demonstrated to the Commissioner of Education that they have a policy, a plan and procedures guaranteeing each handicapped child within the state a "free appropriate public education." 20 U.S.C. § 1412. Arkansas has received grants under the Act and has made a certain percentage available to the local school districts as required by 20 U.S.C. § 1411(b).

To assure that each school district provides a free appropriate education for handicapped children, the state must assure the local educational agency identifies and evaluates each handicapped child within its jurisdiction, formulates and implements an individualized education program (hereafter IEP) designed to meet the needs of the handicapped child. 20 U.S.C. §§ 1413 and 1414.

20 U.S.C. § 1415 requires that parents of handicapped children be allowed to examine and discuss their child's IEP and supporting documents with the school; that parents may obtain review of IEP in an impartial due process hearing before a representative from the state educational agency; and that any party aggrieved by the findings or decision made during the state administrative proceedings can seek review in a United States District Court.

The Act requires the school to provide Sherry Grace with a free appropriate education. The Act, 20 U.S.C. § 1412(5), also requires that:

> [T]o the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes; separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

The Act, 20 U.S.C. § 1401(18) defines "free appropriate public education" as follows:

> [S]pecial education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) [20 USCS § 1414(a)(5)].

The Act also requires that an IEP be developed each year for the child. 20 U.S.C. § 1414(a)(5).

Arkansas has chosen to participate in the Education for Handicapped Children Program. It and each local educational agency within Arkansas, including the Springdale School District, is therefore bound to comply with its provisions.

Arkansas has also enacted legislation guaranteeing education for exceptional children. Ark.Stat.Ann. §§ 80–2102—2143. The Arkansas act is not relevant to the case before the Court, as our jurisdiction is limited by 20 U.S.C. § 1415 to review for compliance with the Education for All Handicapped Children Act, 20 U.S.C. §§ 1401–1461.

The regulations promulgated under the Education for All Handicapped Children Act provide in part as follows:

> As used in this part, the term "free appropriate public education" means special education and related services which:
>
> (a) Are provided at public expense, under public supervision and direction, and without charge.
>
> (b) Meet the standards of the State educational agency, including the requirements of this part.
>
> (c) Include preschool, elementary school, or secondary school education in the State involved, and
>
> (d) Are provided in conformity with an individualized education program which meets the requirements under §§ 121a.340–121a.349 of Subpart C.

45 C.F.R. § 121a.4 (1979).

> (a) As used in this part, the term "handicapped children" means those children evaluated in accordance with §§ 121a.530–121a.534 as being mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, other health impaired, deaf-blind, multi-handicapped, or as having specific learning disabilities, who because of those impairments need special education and related services.

(b) The terms used in this definition are defined as follows:

(1) "Deaf" means a hearing impairment which is so severe·that the child is impaired in processing linguistic information through hearing, with or without amplification, which adversely affects educational performance.

45 C.F.R. § 121a.5 (1979).

The individualized education program for each child must include:

(a) A statement of the child's present levels of educational performance;

(b) A statement of annual goals, including short term instructional objectives;

(c) A statement of the specific special education and related services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs;

(d) The projected dates for initiation of services and the anticipated duration of the services; and

(e) Appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether the short term instructional objectives are being achieved.

45 C.F.R. § 121a.346 (1979).

(a) During the pendency of any administrative or judicial proceeding regarding a complaint, unless the public agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her present educational placement.

(b) If the complaint involves an application for initial admission to public school, the child, with the consent of the parents, must be placed in the public school program until the completion of all the proceedings.

45 C.F.R. § 121a.513.

(a) Each State educational agency shall insure that each public agency establishes and implements procedures which meet the requirements of §§ 121a.550–121a.556.

(b) Each public agency shall insure:

(1) That to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and

(2) That special classes, separate schooling or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

45 C.F.R. § 121a.550.

(a) Each public agency shall insure that a continuum of alternative placements is available to meet the needs of handicapped children for special education and related services.

(b) The continuum required under paragraph (a) of this section must:

(1) Include the alternative placements listed in the definition of special education under § 121a.13 of Subpart A (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions), and

(2) Make provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement.

45 C.F.R. § 121a.551.

Each public agency shall insure that:

(a) Each handicapped child's educational placement: (1) Is determined at least annually;

(2) Is based on his or her individualized education program, and

(3) Is as close as possible to the child's home;

(b) The various alternative placements included under § 121a.551 are available to the extent necessary to implement the individualized education program for each handicapped child;

(c) Unless a handicapped child's individualized education program requires some other arrangement, the child is educated in the school which he or she would attend if not handicapped; and

(d) In selecting the least restrictive environment, consideration is given to any potential harmful effect on the child or on the quality of services which he or she needs.

Our standard for review is set out in the Act, 20 U.S.C. § 1415(e), which provides as follows:

(1) A decision made in a hearing conducted pursuant to paragraph (2) of subsection (b) shall be final, except that any party involved in such hearing may appeal such decision under the provisions of subsection (c) and paragraph (2) of this subsection. A decision made under subsection (c) of this section shall be final, except that any party may bring an action under paragraph (2) of this subsection.

(2) Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

We find that the Springdale School District proved by a preponderance of the evidence that the Arkansas School for the Deaf would provide the *best free education* for Sherry Grace.

At this stage of Sherry's life, the most important thing which she can learn is a language, a means to obtain knowledge. The Court observed several profoundly deaf persons who testified or attended the hearing. The Court noted the skill of the interpreters when translating for the extremely articulate Dr. Garretson and when translating for the less articulate. The Court observed the difficulty Sherry Grace had in comprehending the most simple of questions translated to her and her almost total reliance on gesture in lieu of language in answering.

The IEP developed by the Springdale school recites that Sherry's reading level is that of second grade, as are her skills in arithmetic. It is crucial that she learn a language so that she may be taught how to read and all the other basic skills.

The Arkansas School for the Deaf employs only those teachers who are skilled in Total Communication. Their cumulative experience and expertise would exceed that of the single certified teacher employed by the Springdale school system. The presence of many teachers would give Sherry the benefit of each teacher's explanation and approach, whereas she would receive instruction from only one certified teacher of the deaf at Springdale. It is foreseeable that the certified teacher employed by Springdale to teach Sherry would teach her for more than one year, whereas at the Deaf School, Sherry would have many teachers skilled in Total Communication each year and new ones each year.

The Arkansas School for the Deaf would also provide Sherry with role models, as the evidence established that many of the teachers, grounds keepers, cooks and aides are themselves profoundly deaf, whereas there are no profoundly deaf persons associated with the Springdale school. Both Springdale and the Arkansas School for the Deaf would attempt to have profoundly deaf persons make special appearances at school, but the visits would be more frequent at the School for the Deaf.

The Arkansas School for the Deaf would also provide Sherry the opportunity to have conversations with adults as all teachers, dormitory housemothers, and most other employees have Total Communication training. If Sherry were to remain at the Springdale school, her certified teacher for the deaf would be the only adult skilled in

signing or Total Communication with whom she would have regular contact. The contact with signing adults is important not only to increase her "vocabulary" of signs, but also to increase her general knowledge, an area in which she is particularly deficient as shown by the IEP.

The Arkansas School for the Deaf would surround Sherry with adults and children who sign to each other, whereas Sherry and her certified teacher would be the only ones who knew the "language" at the Springdale school. The omnipresence of signing at the Deaf School cannot be underrated in determining the speed and skill with which Sherry could learn to effectively comprehend others and express herself.

The Arkansas School for the Deaf also has much better facilities for teaching the profoundly deaf. All television sets and movies are equipped with decoders which display the words being spoken. Such tools would greatly help Sherry's reading skills.

The Arkansas School for the Deaf also would provide Sherry a set of friends with whom she could communicate and thereby practice her signing skills during and after school hours. In contrast, the Springdale school contains no children other than Sherry who have signing or Total Communication skills. There likewise are no deaf children in the Springdale, Washington County, area near Sherry's age. (Profound deafness is a low-incidence handicap.) There are no adults skilled in signing or Total Communication who regularly visit the Grace home.

At the Deaf School, Sherry could fully participate in after-school activities such as the Girl Scouts. At Springdale, her attendance at Girl Scouts would hardly constitute participation since there would be no one to interpret for her and at this stage, it is doubtful if she could understand the signs used by an interpreter. The same is true with respect to birthday parties, or other children's activities.

■ The Education for All Handicapped Children Act does not require a State, through its local educational district, to provide each handicapped child with the *best*

education for him; it requires a *free, appropriate education.* P.L. 94–142 § 3(c), 20 U.S.C. § 1401 note.

■ In *Rowley v. Board of Ed. of Hendrick Hudson Central School Dist.,* 483 F.Supp. 528 (S.D.N.Y.1980), the Court addressed the meaning of "appropriate education" as follows:

An "appropriate education" could mean an "adequate" education—that is, an education substantial enough to facilitate a child's progress from one grade to another and to enable him or her to earn a high school diploma. An "appropriate education" could also mean one which enables the handicapped child to achieve his or her full potential. Between those two extremes, however, is a standard which I conclude is more in keeping with the regulations, with the Equal Protection decisions which motivated the passage of the Act, and with common sense. This standard would require that each handicapped child be given an opportunity to achieve his full potential commensurate with the opportunity provided to other children.

We follow the definition contained in *Rowley* and examine whether the IEP as modified after the administrative hearing which calls for Sherry to be placed in the Springdale school would provide Sherry Grace with an opportunity to achieve her full potential commensurate with the opportunity provided to nonhandicapped children.

The nonhandicapped child in the Springdale school elementary system is provided the opportunity to learn language skills, reading, writing, arithmetic, social studies and science. The school provides the nonhandicapped child an opportunity to learn the basics and to learn them well enough that he might excel in his secondary school courses. But the Springdale school does not turn every one of its students into academicians or professionals, or even successful secondary school students. The home life of the child, his parents' interests and the child's cultural and sociological environment often determine the child's academic success and attainment or lack of such.

When we compare what Springdale School delivers to its nonhandicapped students with what it must provide to Sherry Grace under the terms of the IEP, we find, by a preponderance of the evidence, that Sherry Grace can receive an "appropriate" education while enrolled at the Springdale school.

The IEP developed for the 1979–80 school term calls for Sherry receiving instruction from a certified teacher for the deaf in manual communication, lipreading, writing and speaking. Sherry will also receive instruction in reading, arithmetic, spelling, the telling of time, handwriting, health, social sciences and art by the certified teacher. Although it is likely that Sherry could learn much more quickly at the Arkansas School for the Deaf, we note that both the Arkansas School for the Deaf and the Springdale School would be teaching the same subjects to her through certified teachers for the deaf.

The defendants introduced the testimony of teachers of the deaf who have taught students similar to Sherry in other schools in a single-teacher, single-student environment. Their testimony reveals that it is possible to teach the profoundly deaf under such circumstances and have them perform at levels comparable to the nonhandicapped. The plaintiff has not evinced one fact about Sherry which indicates that she cannot receive an appropriate education at the Springdale School, although plaintiff thoroughly proved that the Arkansas School for the Deaf was preferable.

The plaintiff proved that Sherry had made little progress during the 1979–80 term while enrolled in Springdale. During the 1979–80 term, Sherry did not have the benefits of a certified teacher of the deaf who instructed her for the great part of the school day in Total Communication and the substantive academic subjects. Only for the second semester did Sherry have the benefit of the interpreter in class with her. Her lack of progress during the 1979–80 term is not indicative of whether Sherry can receive an appropriate education at the Springdale School in accord with her individual requirements as set out in the IEP.

Having determined that Sherry can receive an appropriate free education at both the Springdale School and the Arkansas School for the Deaf, we address the issue of "mainstreaming." 20 U.S.C. § 1412(5)(B) requires that "to the maximum extent" possible, without sacrificing the child's right to an appropriate education, the handicapped must be educated with the nonhandicapped. Plaintiff urges that at Springdale Sherry would be separated for the great part of each school day not only from nonhandicapped children, but also from all other children, as she will be required to spend so much time alone with the certified teacher of the deaf. Plaintiff urges that this is more "restrictive," as that term is used in 45 C.F.R. § 121a.550, than placing Sherry at the School for the Deaf.

The statute is clear. It calls for a child to be educated with nonhandicapped children to the extent consistent with the child's receiving an appropriate education. At the Springdale School, Sherry would be at recess with nonhandicapped children and would be with them for physical education, library and possibly for penmanship, science, health, social studies, music or art. At the School for the Deaf, her contacts with nonhandicapped students would not be in the regular course of the school day. Since the Springdale School can provide her an appropriate education and also meets the mainstreaming requirements of 20 U.S.C. §§ 1412(5)(B) and 1414(a)(1)(C)(iv), we hold that the Arkansas Department of Education's modification of the IEP was correct.

■ The defendants, Albert Grace, Joann Grace and Sherry Grace, have counterclaimed against the Springdale School seeking a preliminary injunction requiring the Springdale School to hire a certified teacher of the deaf, otherwise to implement the IEP developed for Sherry and to provide a summer program to remedy the deficiencies incurred during the 1979–80 school term. In their answer, the Graces also claim attorneys' fees under 31 U.S.C. § 1244(e), which provides as follows:

(e) In any action under this section to enforce section 1242(a) of this title, the court, in its discretion, may allow to the prevailing party, other than the United States, reasonable attorney fees, and the United States shall be liable for fees and costs the same as a private person.

31 U.S.C. § 1242(a) provides as follows: (a)(1) In general.—No person in the United States shall, on the ground of race, color, national origin, or sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity of a State government or unit of local government, which government or unit receives funds made available under subchapter I of this chapter. Any prohibition against discrimination on the basis of age under the Age Discrimination Act of 1975 or with respect to an otherwise qualified handicapped individual as provided in section 794 of Title 29 shall also apply to any such program or activity. Any prohibition against discrimination on the basis of religion, or any exemption from such prohibition, as provided in the Civil Rights Act of 1964 or title VIII of the Act of April 11, 1968, hereafter referred to as Civil Rights Act of 1968, shall also apply to any such program or activity.

(2) Exceptions.—

(A) Funding.—The provisions of paragraph (1) of this subsection shall not apply where any State government or unit of local government demonstrates, by clear and convincing evidence, that the program or activity with respect to which the allegation of discrimination has been made is not funded in whole or in part with funds made available under subchapter I of this chapter.

(B) Construction projects in progress.—The provisions of paragraph (1), relating to discrimination on the basis of handicapped status, shall not apply with respect to construction projects commenced prior to January 1, 1977.

The counterclaim for attorneys' fees must be denied as there is no statutory basis for it, 31 U.S.C. § 1244(e) being inapplicable.

■ To the extent the counterclaim seeks an injunction requiring the Springdale School to provide Sherry with the certified teacher of the deaf and the other educational needs outlined in the IEP, the injunction should issue, even though it will apply to the 1980–81 school term only. *Rowley (Rowley II) v. Board of Education*, 483 F.Supp. 536 (S.D.N.Y.1980).

The Graces also seek an injunction requiring the Springdale School to provide a summer program to remedy the educational deficiencies Sherry incurred during the 1979–80 school term.

The Court declines to issue an injunction requiring the Springdale School to provide a summer school program for Sherry Grace. It would take time for the Springdale School to implement such a program and given the short time remaining before the 1980–81 fall terms begins, no injunction should issue.

The Springdale School asked this Court to hold that the Arkansas School for the Deaf is the most appropriate placement for Sherry Grace. Since Sherry Grace is a minor whose parents reside in Springdale, Arkansas, approximately 170 miles from the Arkansas School for the Deaf, the court raised the issue of its authority to take action which would remove effectively the child from her parents' home. Having decided that Sherry should remain at the Springdale School for the 1980–81 school term, we need not and do not address that issue.

We point out that after Sherry has attended the Sprindale School for one school year, she should be re-evaluated and proper steps taken to comply with the existing law.

We also note that, upon reflection, Sherry's parents may be more desirous that their child receive the *best* instead of a mere "appropriate" scholastic exposure.

A separate judgment will be prepared in accord with this opinion. Each party will bear his or its own costs.