Joseph CAMPBELL, a minor by his parents and guardians as next friends, Plaintiff,

v.

TALLADEGA COUNTY BOARD OF EDUCATION and Board of Education of the State of Alabama, Defendants.

Civ. A. No. 79-M-277-E.

United States District Court, N. D. Alabama, E. D.

March 31, 1981.

Order On Motion For Attorney's Fees June 19, 1981.

Robert J. Varley, Patricia E. Ivie, Legal Services Corp. of Alabama, Inc., Montgomery, Ala., for plaintiff.

Ralph D. Gaines, Jr., William W. Goodrich, Gaines, Cleckler, Robbins & Goodrich, Talladega, Ala., for defendant County Bd. of Ed.

**48**

Charles S. Coody, Montgomery, Ala., for defendant State Bd. of Ed.

## OPINION

VANCE, Circuit Judge, Sitting by Designation.

Plaintiff Joseph Campbell brings this suit under the Education for All Handicapped Children Act (EHA), 20 U.S.C. §§ 1401, et seq.; Section 504 of the Rehabilitation Amendments of 1973, 29 U.S.C. § 794; 42 U.S.C. § 1983; and the due process and equal protection clauses of the fourteenth amendment.[1] He charges that defendants have violated his right to a free appropriate education and seeks declaratory, injunctive and monetary relief. Defendants are the Talladega County Board of Education (the County Board) and the Alabama State Board of Education (the State Board).[2] The findings of fact and conclusions of law required under Fed.R.Civ.P. 52(a) are incorporated into the following opinion.

### I.

Joseph Campbell is 18 years old and lives with his family in Talladega County, Alabama. Joseph is generally described as "severely retarded." At present he is enrolled in the Talladega County school system at the Munford Center, a facility on the campus of Munford High School attended exclusively by handicapped children.

Joseph's family moved to Talladega County in 1973. Although they had sought educational services for Joseph before that time, they had been unable to enroll him in school. In early 1974 they sought services for Joseph from the Talladega school system. The school made a limited attempt to test Joseph but was unable to obtain a measurable response from him. Subsequently, the school notified Joseph's family that custodial care was the only service available. In early 1976, Joseph was enrolled by his parents in the Clay County Learning Center. To enable Joseph to attend, his mother drove him 24 miles to the county line where a bus picked him up and took him to the learning center. In the afternoons, she repeated the trip to bring him home.

Joseph remained at the Clay County Center for nearly two years until the difficulties in transportation made further education there impractical. At that time the Campbells were told by representatives of the County Board that the only services which it could provide would be a homebound program consisting of about an hour of instruction daily. No testing preceded this offer. In January 1978 the Campbells rejected this program. Following this rejection, the County Board tried to evaluate Joseph. Its efforts consisted of an attempt to administer a Stanford Binet IQ test. The examiner received no measurable response on any of the test items. Following this, the County Board again offered a homebound placement, which was again rejected. The Campbells then sought a due process hearing under the provisions of the EHA.[3]

The decision of the hearing panel that was rendered in March, 1978 found the

---

1. Plaintiff also states that defendants have violated the Alabama Exceptional Child Education Act, Ala.Code §§ 16–39–1 et seq. The Act does not expressly provide a private right of action and the Alabama courts have not considered whether an implied right of action exists. Since the Act does not supply additional grounds for relief in this case, this court will not attempt to decide a question best decided by a state court and instead declines to exercise pendent jurisdiction over plaintiff's state claims.

2. Plaintiff originally filed suit against several individual defendants who were later voluntarily dismissed from the case.

3. 20 U.S.C. § 1415(b)(2) provides for a hearing:

   Whenever a complaint has been received ... the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency. No hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in. the education or care of the child.

homebound program to be inappropriate and ordered that Joseph be educated with other students. It also found that the County Board had committed various due process violations in dealing with the Campbells.

As a result of this hearing, Joseph was enrolled in the Talladega system at the Drew Middle School for the last two months of the 1977–78 school year. There, Joseph and two other students met with their teacher in the rear of a classroom used by a "trainable mental retardation" class in a section curtained off for their use.

In the summer of 1978, the County Board offered an Individualized Education Program (IEP) as required by the EHA outlining the services to be provided Joseph in the coming year.[4] The plan called for his placement at the Munford Center. Because Joseph's parents felt that the plan was inappropriate and provided for insufficient contact with nonhandicapped students, they rejected it and applied for a second due process hearing. In October 1978 the hearing panel announced its decision, concluding that Joseph's testing and program were appropriate, and that evidence did not substantiate the contention that Joseph's IEP failed to provide for interaction with nonhandicapped children during a significant portion of his school day.

On October 24, 1978, the Campbells requested an administrative review of the panel's decision. This hearing took place on January 10, 1979. Prior to this review, they had requested a transcript of the due process hearing but were provided only with largely unintelligible tapes. The administrative review affirmed the decision of the due process panel, finding that Joseph's IEP provided for sufficient contact with nonhandicapped children. This litigation followed, during which time Joseph has continued his program at the Munford Center.

Although he is 18, Joseph has a mental age of approximately two and a half. He is almost entirely nonverbal, though he engages in some receptive and expressive communication with others. He suffers from deficiencies in motor skills and has difficulty climbing stairs and in holding some objects. Nevertheless, Joseph has learned, for the most part from his parents, a variety of self-help skills. He has been trained to use the toilet, to eat with a fork and spoon, and to help in making beds. He enjoys the company of others and interacts well with his two nonhandicapped brothers. Joseph's communication skills are sharply limited, however, and he exhibits inappropriate behavior such as inappropriate touching, hair-pulling, and throwing food to the ground. Although there was some disagreement as to the precise degree of his handicap, the evidence established and the court finds that he is severely to moderately retarded and that his mental abilities place him in the lowest 1% of the population.

Despite the severity of Joseph's handicap, testimony clearly established that he is capable of learning. After spending between 10 and 15 hours with Joseph, a clinical psychologist concluded that he was capable of functioning at higher levels than at present. She noted that Joseph has the desire to communicate and all the prerequisites for symbolic communication. Demonstrated memory skills likewise indicate trainability. Evidence from experts in the

---

4. 20 U.S.C. § 1401(19) defines IEP:

The term "individualized education program" means a written statement for each handicapped child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

field of educating the handicapped who had observed Joseph established to the court's satisfaction that students far more severely retarded had been taught skills significantly above his present level.

Much of the testimony at trial concerned the appropriateness of Joseph's present placement at the Munford Center. The thrust of plaintiff's evidence was that in view of Joseph's capacity, an appropriate educational program would be one aimed at the goal of eventually integrating him into society to the greatest extent possible. Joseph's educational plan should therefore provide him with the functional and communication skills which would allow him to be employed in a sheltered environment and reside in a group home.

Plaintiff's experts testified that this goal was subverted by the failure to provide adequate interaction between Joseph and nonhandicapped students. The evidence established that the Center, a renovated wood-framed house, is set some distance from Munford High School and is separated from the high school by a fence. No non-handicapped students are present at the center. Joseph rides to school on a specially equipped bus which is also used only by handicapped students. Joseph's contacts with nonhandicapped students are generally confined to lunchtimes, when he is taken to eat in the high school cafeteria. Even here, however, his contacts are minimal. He is generally seated with his teacher before the rest of the students enter and does not interact with the nonhandicapped population. Although students at the Munford Center theoretically participate in high school assembly programs, Joseph's teacher testified that he has attended only one assembly so far this year. Except for involvement in a special olympics for handicapped children, Joseph has experienced no other interaction with nonhandicapped students during school hours.

Plaintiff's expert witnesses testified that such separation deprived Joseph entirely of essential role models; in his present program Joseph can imitate the behavior only of other handicapped children. Moreover, because of his isolation Joseph receives no opportunity to learn how to interact with nonhandicapped students. The testimony of these witnesses established to the court's satisfaction that considerable interaction between nonhandicapped and mentally handicapped children may be achieved when they are educated under the same roof and that such integration has been attained successfully in school districts across the country.

Expert witnesses called upon to testify by defendants did not, for the most part, address the specific amount of interaction with nonhandicapped students appropriate for Joseph. They offered general testimony, however, that separate centers for handicapped students are not uncommon in this area of the country and that in interaction with nonhandicapped students handicapped students may be exposed to ridicule and encouraged to imitate undesirable behavior. The Superintendent of Talladega County Public Schools, while not claiming expertise in the education of the handicapped, testified that the Munford Center provided an appropriate education because it brought together teachers in a centralized locale.

The testimony of plaintiff's experts, which is credited by the court, demonstrated that the problems with Joseph's program are not confined to the restrictions on his contacts with nonhandicapped students. Joseph's program teaches him virtually no functional skills—skills needed to perform useful acts that if not accomplished by Joseph would have to be accomplished by another person. Instead, the majority of his time is spent in activities such as bead-stringing, watching *Sesame Street* on television and listening to records.[5] Indeed,

5. Joseph's typical schedule is as follows:

| | |
|---|---|
| 8:30 – 9:00 – | Arrival. Toothbrushing and Self-Help Skills. |
| 9:00 – 9:15 – | PE on Tuesday and Thursday and alternating Fridays. |
| 9:00 –10:00 – | Puzzle. |
| 10:00 –10:20 – | Wash hands and prepare for lunch (drinking skills). |
| 10:20 –11:00 – | Lunch – personal hygiene. |
| 11:00 –12:00 – | Sesame Street with groups. |

one educator who observed a typical school day found that only half an hour of a four hour period offered any instruction at all related to Joseph's IEP. Joseph's program suffers from its lack of individualization. Created from commercially prepared program materials, the program has not been shaped to Joseph's specific needs. This problem is compounded by the lack of detailed evaluation and record keeping. Since it is very difficult for a student of Joseph's abilities to acquire a skill, it is vital that time be usefully spent, that approaches which persistently fail be dropped and that achievements be built upon. Records of progress in a skill must be kept in order to assess the steps already accomplished. Even Joseph's IEP itself, however, was practically unchanged from one year to the next.

Plaintiff's witnesses stressed the importance of excursions into the world beyond the classroom to accustom Joseph to assuming a minimally independent role in everyday activities. In addition to many other specific suggestions, they emphasized the value of a prevocational program to prepare Joseph to participate in a sheltered work environment. Such programs, they testified, had been employed successfully with severely handicapped students in many school districts around the country. In summing up, one of plaintiff's witnesses stated that Joseph's current program is not merely useless but is actively harmful.

Defendants presented little testimony regarding the appropriateness of the specific

12:00 – 1:00 – Art and music.

12:45 – 1:30 – Speech on Fridays.

1:00 – 1:30 – Individual instruction – speech sounds.

1:30 – 1:45 – Snack – drinking skills.

1:45 – 2:00 – Individual instruction (safety and wearing earphones).

2:00 – 2:15 – Restroom and prepare to go home.

2:20  Dismissal for home.

**6.** In its statement of findings and purpose the EHA states: "It is in the national interest that the Federal Government assist State and local efforts to provide programs to meet the educational needs of handicapped children in order to

items on Joseph's IEP. One expert witness testified in general terms that Joseph was receiving an appropriate education. He noted, however, that Joseph's teacher was minimally trained and that acquiring and keeping qualified special education teachers is a significant problem in many parts of Alabama. Other witnesses testified similarly as to the shortage of competent personnel.

## II.

Plaintiff has charged defendants with violation of the EHA, Section 504, Section 1983, and the due process and equal protection clauses of the fourteenth amendment. Although these form independent bases of jurisdiction, the discussion in this opinion will focus upon the provisions of the EHA. The EHA provides a far more detailed statutory framework in which to deal with the issues of this case than Section 504. As the regulations promulgated under Section 504 indicate, a school system will provide the free and appropriate education and procedural safeguards mandated by Section 504 by complying with the EHA. *See* 34 C.F.R. §§ 104.33(b)(2) and 104.36. Similarly, in view of the detailed procedures set forth in the EHA and Congress' clear intention to guarantee for handicapped students the equal protection of the laws,[6] adherence to the EHA will insure that constitutional requirements have been met.

In the EHA Congress established a program of financial assistance to the states to

assure the equal protection of the law." Pub.L. No.94–142, § 3(a), Stat. (1975), *reprinted at* 20 U.S.C.A. § 1401 (West 1978) (historical note). The Senate Report states: "It is this Committee's belief that the Congress must take a more active role under its responsibility for equal protection of the laws to guarantee that handicapped children are provided equal educational opportunity." S.Rep.No. 168, 94th Cong., 1st Sess. 6 *reprinted in* [1975] U.S.Code Cong. & Ad.News 1425, 1433. In drafting the EHA Congress was clearly influenced by a number of cases finding a constitutional basis for a handicapped child's right to an education. *See id.* at 1430. *See, e. g., Mills v. Board of Educ.*, 348 F.Supp. 866 (D.D.C.1972); *Pennsylvania Ass'n for Retarded Children v. Pennsylvania*, 334

enable them to meet their responsibilities in educating handicapped children. This assistance was conditioned upon the provision of "a free appropriate public education" to all handicapped children. Alabama and Talladega County have chosen to receive federal funds in financing the education of the handicapped. Defendants must thus adhere to the conditions accompanying the federal grant. Ultimate responsibility for compliance rests with the State Board. 20 U.S.C. § 1412(6).

Congress did not attempt to provide detailed substantive content to the concept of an "appropriate" education. Instead, emphasizing the uniqueness of each handicapped child's educational requirements, Congress defined appropriate education as "special education and related services which ... are provided in conformity with the individualized education program." 20 U.S.C. § 1401(18). The IEP is thus at the heart of the congressional scheme. It is a document to be developed by parents and educators working together that states the child's present level of performance, the objectives of his program and the services that will achieve them, and "appropriate objective criteria" for determining success.

*Id.* § 1401(19). To insure that the IEP accurately reflects the needs of the child, the Act requires that no single procedure—such as an IQ test—be relied on exclusively in evaluating his strengths and weaknesses.[7]

In order to meet the needs of handicapped children for special education and related services, the EHA requires that a continuum of alternative placements be available. *See* 45 C.F.R. § 121a.155. For the purposes of determining placement, the Act sets forth a second criterion in addition to the general requirement of appropriateness: "[T]o the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are [to be] educated with children who are not handicapped . . . ." 20 U.S.C. § 1412(5)(B). The Act thus specifically applies the maximum integration requirement even to institutionalized children. In addition, regulations promulgated under the EHA and Section 504 make clear that this requirement of maximum integration extends to nonacademic settings and extracurricular services and activities including meals and recess periods. *See* 45 C.F.R. 121a.553; 34 C.F.R. § 104.34(b). The

---

F.Supp. 1257 (E.D.Pa.1971), *modified*, 343 F.Supp. 279 (1972).

**7.** 20 U.S.C. § 1412(5)(C) requires the State to establish testing procedures and evaluation materials that are not racially or culturally discriminatory. Additionally, the statute states that *"no single procedure shall be the sole* criterion for determining an appropriate educational program for a child." (emphasis added). This requirement is spelled out in detail in the implementing regulations.

45 C.F.R. § 121a.532 states:

State and local educational agencies shall insure, at a minimum, that:

(a) Tests and other evaluation materials:

(1) Are provided and administered in the child's native language or other mode of communication, unless it is clearly not feasible to do so;

(2) Have been validated for the specific purpose for which they are used; and

(3) Are administered by trained personnel in conformance with the instructions provided by their producer;

(b) Tests and other evaluation materials include those tailored to assess specific areas of educational need and not merely those

which are designed to provide a single general intelligence quotient;

(c) Tests are selected and administered so as best to ensure that when a test is administered to a child with impaired sensory, manual, or speaking skills, the test results accurately reflect the child's aptitude or achievement level or whatever other factors the test purports to measure, rather than reflecting the child's impaired sensory, manual, or speaking skills (except where those skills are the factors which the test purports to measure);

(d) No single procedure is used as the sole criterion for determining an appropriate educational program for a child; and

(e) The evaluation is made by a multidisciplinary team or group of persons, including at least one teacher or other specialist with knowledge in the area of suspected disability.

(f) The child is assessed in all areas related to the suspected disability, including, where appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities.

analysis of the Section 504 Regulations notes that "[t]his requirement is especially important for children whose educational needs necessitate their being solely with other handicapped children during most of each day." 34 C.F.R. § 104—Appendix A, Subpart D, Paragraph 24.

In applying the law to the facts of this case, we must thus decide whether the education that Joseph is receiving at the Munford Center is appropriate and whether he is being placed in contact with nonhandicapped children to the maximum extent consistent with an appropriate program.

As noted, Congress did not attempt to create a detailed definition of an appropriate education for children operating under a vast range of handicaps. It chose instead to rely in the first instance on local educators acting in concert with the child's parents to develop an IEP under the guidelines of the Act. While primary responsibility is, in accordance with tradition, placed upon state and local educators, the Act does not command unlimited deference to their judgments as to the appropriateness of methods

and goals. It was congressional dissatisfaction with inadequate educational opportunities for the handicapped provided by the states, whether due to inadequate funding or policy choices, that originally prompted federal action.[8] The limits of deference are further marked by the elaborate system of procedural safeguards and hearings, including review in federal court based on the preponderance of the evidence.[9] While this court is sharply aware of its lack of expertise in educational matters, the judicial function not infrequently involves the application of law to unfamiliar fields where reliance must be placed upon the testimony of experts.

While agreeing that the determination of "appropriateness" is a proper judicial function, other courts have experienced difficulty in settling upon a standard. In *Rowley v. Board of Education,* 483 F.Supp. 528, 534 (S.D.N.Y.), *aff'd,* 632 F.2d 945 (2d Cir. 1980), the court held that an "appropriate" education for an exceptionally intelligent deaf child encompassed more than merely

8. The congressional findings state:
   The Congress finds that—
   (1) there are more than eight million handicapped children in the United States today;
   (2) the special educational needs of such children are not being fully met;
   (3) more than half of the handicapped children in the United States do not receive appropriate educational services which would enable them to have full equality of opportunity;
   (4) one million of handicapped children in the United States are excluded entirely from the public school system and will not go through the educational process with their peers;
   (5) there are many handicapped children throughout the United States participating in regular school programs whose handicaps prevent them from having a successful educational experience because their handicaps are undetected;
   (6) because of the lack of adequate services within the public school system, families are often forced to find services outside the public school system, often at great distance from their residence and at their own expense;
   (7) developments in the training of teachers and in diagnostic and instructional procedures and methods have advanced to the point that, given appropriate funding, State

and local educational agencies can and will provide effective special education and related services to meet the needs of handicapped children;
   (8) State and local educational agencies have a responsibility to provide education for all handicapped children, but present financial resources are inadequate to meet the special educational needs of handicapped children; and
   (9) it is in the national interest that the Federal Government assist State and local efforts to provide programs to meet the educational needs of handicapped children in order to assure equal protection of the law. 20 U.S.C.A. § 1401 (West 1978) (historical note).

9. The preponderance of the evidence standard codified at 20 U.S.C. § 1415(e)(2) reflects a decision to accord a greater role in the enforcement scheme to the federal courts. The original House version which provided that the determination of the state agency would be "conclusive in any court of the United States if supported by substantial evidence" was rejected by the conference committee and the present language was substituted. S.Rep.No. 455, 94th Cong., 1st Sess. 47–50 (1975), *reprinted in* [1975] U.S.Code Cong. & Ad.News 1480, 1500–02.

those services that would enable her to graduate from grade to grade. *See also Age v. Bullit County Public Schools*, 3 EHLR 551:505, 506 (W.D.Ky.1980) (stating that "the intent of the Act is to furnish the optimum in the way of education to those to whom nature has dealt less than a full hand"); Note, *Enforcing the Right to an Appropriate Education: The Education for All Handicapped Children Act of 1975*, 92 Harv.L.Rev. 1103, 1125–26 (1979). Dissenting on appeal from the standard set forth by the district court in *Rowley*, Judge Mansfield stated:

> The language and legislative history of the Act demonstrate that Congress visualized a much more practical objective, i. e. an education for each handicapped child that would enable the child to be as free as reasonably possible from dependency on others, would enable the child to become a productive member of society, and would hopefully promote academic achievement by the child that would roughly approximate that of his or her nonhandicapped classmates. A child's unique needs are met whenever the child's IEP enables the child to meet those goals.

632 F.2d at 953. Joseph's case does not pose the particular difficulties presented in *Rowley*, and we need not attempt to resolve the conflict between its majority and dissenting opinions. What seems clear after consulting the legislative history is that an IEP must at least embody the objectives suggested by Judge Mansfield if it is to conform to the purposes of the EHA. As the Senate Report states in discussing the goals of the Act, "With proper education services, many [handicapped children] would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such services, would increase their independence, thus reducing their dependence on society." S.Rep.No.94–168, 94th Cong., 1st Sess., *reprinted in* [1975] U.S.Code Cong. & Ad.News 1425, 1433.[10]

■ After carefully weighing the testimony, this court finds that Joseph's program fails in design and execution to further his progress in attaining such self-sufficiency as he may be capable of. As the program stands at present, it does little more than to occupy his time with activities devoid of educational justification. While the program may not be, as plaintiff's witness suggested, an actual impediment to progress, it is ill suited to impart to Joseph any functional or communicative skills which might, to whatever degree, increase his independence. The court finds that Joseph's program thus fails to meet even a minimally stringent standard of appropriateness.

We must next decide the related question of whether Joseph is being educated with nonhandicapped children to the maximum extent appropriate. Other courts in interpreting the EHA have recognized the central significance of the mainstreaming requirement in the structure of the Act. In *Springdale School Dist. v. Grace*, 494 F.Supp. 266 (W.D.Ark.1980), a school system argued that the best education for a profoundly deaf child could be obtained at a school for the deaf. While the court agreed that the *best* education was offered by the school for the deaf, it found that placement in a public school supplemented by auxiliary services would nevertheless provide an *appropriate* education. In view of the clear mandate of the Act to integrate handicapped children to the greatest extent possible, the court ordered the child to be edu-

---

**10.** Statements made during the debate over the EHA cited by Judge Mansfield confirm that at the very least Congress was concerned to give to handicapped children the skills needed to participate in society to the fullest extent possible. *See, e. g.*, remarks of Senator Williams supporting the view expressed by the Secretary of Health, Education and Welfare that one goal of the Act was to enable handicapped persons to become "productive citizens, capable of con-

tributing and even more, capable of self respect and pride which they so rightly deserve." 121 Cong.Rec. 37416 (1975). *Cf. Battle v. Pennsylvania*, 629 F.2d 269, 280 (3d Cir. 1980) (stating that reasonable educational standards may be set by the states but that these standards must allow for individual consideration of each handicapped child and invalidating state rule limiting education to 180 days per year).

cated in a regular public school classroom. Other courts have similarly recognized the importance of the mainstreaming requirement. *See, e. g., Tatro v. Texas*, 625 F.2d 557, 561 (5th Cir. 1980); *Kruelle v. Biggs*, 489 F.Supp. 169, 174 (D.Del.1980); *Hairston v. Drosick*, 423 F.Supp. 180, 183–84 (S.D.W. Va.1976) (decided under Section 504).

■ At the present time Joseph has virtually no contact with nonhandicapped students outside of his lunch period and even then such contacts are few. From the testimony presented, this court finds that Joseph is not placed into contact with nonhandicapped students to the maximum extent consistent with an appropriate education program. Although defendants' experts dispute the soundness of the mainstreaming approach to the education of the handicapped, Congress has made a clear choice among competing educational philosophies.[11] In electing to receive federal funds, the State of Alabama has bound itself to act in accordance with that philosophy. No evidence suggested that Joseph would be unable to benefit from increased contacts with nonhandicapped students provided he receives proper supervision. On the contrary, considerable evidence established that such interaction is essential to provide him with role models and to increase his ability to act independently.

In summary, defendants have acted from the conviction that Joseph Campbell was capable of little progress toward self-sufficiency. This conviction may have resulted from the failure to offer Joseph a full range of appropriate tests or it may have stemmed in part from widely held social stereotypes concerning the abilities of re-

tarded citizens. Consequently, a program was developed, the chief function of which was to occupy Joseph's time in as pleasant a manner as possible. Rather than deal with the difficulties that must necessarily accompany challenge, the school effectively isolated him from the nonhandicapped population. While we sympathize with the problems that the Talladega school system faces, its assumptions about Joseph's ability are inconsistent with the evidence presented at trial and its actions are in clear violation of the law.

### III.

In view of defendants' failure to provide Joseph with an appropriate education and maximum association with nonhandicapped students, this court finds the plaintiff entitled to the following relief:

First, Joseph's Individualized Education Program must be readjusted to focus on the acquisition of functional skills.[12] Specifically, Joseph's IEP should include instruction in age-appropriate and functional skills in each of the following four areas: (1) daily living activities, (2) vocational activities, (3) recreational activities, and (4) social and community adjustment. In addition, his IEP should provide for instruction leading to the development of appropriate non-verbal communication skills. The IEP should also make specific provisions for the measurement of Joseph's progress in all areas. The program must cover the County Board's entire school year including the summer session.

The court notes that it was extremely impressed by the testimony of Dr. H. D. Fredericks of Teaching Research in Mon-

11. Defendants' chief expert witness, who was also chairman of Joseph's second due process panel, testified to the court that he was inalterably opposed to the philosophy of Congress evident in the mainstreaming requirements.

12. Other courts have found it necessary to rely upon expert testimony in evaluating the needs and placement of handicapped children. *See, e. g., Springdale School Dist. v. Grace*, 494 F.Supp. 266 (W.D.Ark.1980) (upholding parents' request for child's placement in regular school after analysis of child's educational

needs and statutory requirements); *Kruelle v. Biggs*, 489 F.Supp. 169 (D.Del.1980) (overruling school system's recommendations and ordering appropriate placement on basis of expert testimony); *Laura M. v. Special School Dist. No. 1*, 3 EHLR 552:152 (D.Minn.1980) (ordering placement of handicapped child and directing school system to include specified services in child's IEP); *Age v. Bullit County Public Schools*, 3 EHLR 551:505 (W.D.Ky.1980) (determining most appropriate education for deaf child on basis of expert testimony).

mouth, Oregon. Teaching Research has the only "model" training program for administrators and teachers serving severely handicapped children which has been given official approval by the United States Department of Education. In addition to training teachers and staff, Teaching Research has also been involved in the development and use of model programs and curricula for severely handicapped students. One means by which defendants may comply with this decree is to engage the services of Teaching Research in the development of an appropriate program.

Second, the court is concerned that Joseph's teacher and the Talladega coordinator of special education be trained in the techniques essential to an appropriate program. Defendants will therefore be ordered to provide suitable in-service training to Joseph's teacher and to the special education coordinator. One means by which defendants may comply with this decree is to insure the attendance of Joseph's teacher and the special education coordinator at the training program at Teaching Research.

Third, it is necessary that Joseph's new IEP provide for significantly increased contact with nonhandicapped students. One means by which this may be accomplished is to place Joseph's class into the main high school building at Munford High School or Talladega County High School. Alternatively, the school may choose to educate nonhandicapped as well as handicapped students in the Munford Center so that the Center ceases to be an isolated enclave for the handicapped. If defendants choose neither of these approaches, they bear the heavy burden of insuring that Joseph's interaction with nonhandicapped students will be substantially equal to that he would enjoy were his classroom located in the main school building. Whatever alternative is chosen, defendants may further insure compliance by also investigating the possibility raised in expert testimony of recruiting volunteers from among the student body to work with handicapped students.

Fourth, while the court recognizes that no education can adequately compensate Jo-

seph for past deprivations, under an appropriate IEP significant progress is still possible. Accordingly, defendants will be ordered to provide Joseph with a free and appropriate public education for two years past his 21st birthday.

To insure the development and implementation of an appropriate remedy, this court will retain jurisdiction of this case. Defendants are required to submit to the court within 60 days of the date of this decree Joseph's IEP for the 1981–82 academic year. By a supplementary memorandum to be submitted at the same time, defendants should state in detail the manner in which maximum integration with nonhandicapped students will be achieved. The memorandum should also notify the court of what provisions have been made for suitable in-service training.

■ In addition to injunctive relief, plaintiff has requested damages. This court is empowered under 20 U.S.C. § 1415(e)(3) of the EHA to "grant such relief as the court determines is appropriate." While this language appears to permit an award of damages, courts dealing with the issue are in conflict. *Compare Monahan v. Nebraska*, 491 F.Supp. 1074, 1094 (D.Neb.1980), *and Boxall v. Sequoia Union High School District*, 464 F.Supp. 1104, 1112 (N.D.Cal.1979) (permitting damages), *with Loughran v. Flanders*, 470 F.Supp. 110, 115 (1979) (finding damages not authorized). Whether damages are awardable under Section 504 is similarly an open question in this circuit, *see Camenisch v. University of Texas*, 616 F.2d 127, 132 n.10 (5th Cir. 1980), and other courts have divided on the issue, *compare Poole v. South Plainfield Board of Education*, 490 F.Supp. 948, 949 (D.N.J.1980) *and Patton v. Dumpson*, 498 F.Supp. 9331, 3 EHLR 551:526 (S.D.N.Y.1980) (permitting damages) *with Miener v. Missouri*, 498 F.Supp. 949, EHLR 551:526 (E.D.Mo.1980) (damages not authorized). There is thus support for damage awards against agencies not protected by the eleventh amendment under either the EHA or Section 504 as well as under Sec-

tion 1983.[13] It seems clear that much of the damage Joseph has suffered stems from educational deprivations in his formative years. It is impossible, however, to determine with any certainty from the evidence presented the extent to which Joseph's damages predated his family's move to Talladega County.[14] Although it is not necessary that damages be ascertained precisely, the amount of damages must be capable of some reasonable determination. This circuit has applied this principle in other contexts. *See, e. g., Fredonia Broadcasting Corp. v. RCA Corp.*, 481 F.2d 781, 804 (5th Cir. 1973) (applying Texas law); *Travelers Indemnity Co. v. Peacock Construction Co.*, 423 F.2d 1153, 1157 (5th Cir. 1970) (applying Florida law). Accordingly the court holds that Joseph is not entitled to an award of money damages.

■ Finally, the court holds that reasonable attorneys' fees will upon appropriate application be awarded to plaintiff pursuant to Section 505, 29 U.S.C. § 794a(b). *See United Handicapped Federation v. Andre*, 622 F.2d 342, 348 (8th Cir. 1980) (recognizing the entitlement to attorneys fees under 29 U.S.C. § 794a(b)).

It is therefore ORDERED and ADJUDGED that judgment be entered in conformity herewith.

### ORDER ON MOTION FOR ATTORNEYS' FEES

In its order of March 31, 1981 the court held that plaintiff in this case was entitled to reasonable attorneys' fees. Plaintiff was represented in this case by Ms. Patricia E. Ivie and Mr. Robert J. Varley, both of the Legal Services Corporation of Alabama, Inc. Both attorneys have submitted oral testimony and affidavits concerning the hours spent in various aspects of this case as well as their original time records. Affidavits of attorneys in Birmingham and Montgomery concerning the hours demanded in the preparation of a case of this kind and the reasonableness of the hourly rate requested were introduced.

Ms. Ivie's affidavit states that she has spent 524¼ hours in preparing and litigating plaintiff's case, not including time spent in pursuing administrative remedies prior to the filing of this case. She has requested that the fee award be based upon an hourly rate of $70.00.

Mr. Varley's affidavit states that he has spent 300 hours on this case. He requested the fee award be based upon an hourly rate of $60.00.

Plaintiffs attorneys have listed long distance telephone charges totaling $235.18.

On the basis of the evidence submitted, its observation of the handling of this case, and its knowledge of legal practice in this area, the court makes the following findings and award in conformity with the factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

(1) *Time and Labor Required.* The court has considered the original time records submitted by plaintiff's attorneys and has read the supporting affidavits of local attorneys. Defendants have not pointed to any item charged by plaintiff's attorneys which they regard as excessive. The work of plaintiff's attorneys has been thorough and of consistently high quality. Although Mr. Varley entered the case later than Ms. Ivie, and possessed no special expertise in the law concerning the education of handicapped children, he has stated to the court that the time spent in familiarizing himself with this area has not been included in his request for fees. The court also notes that Ms. Ivie's work at the administrative level was not included in the fee application even though it may have provided a valuable

---

**13.** *See, e. g., Medley v. Ginsberg*, 492 F.Supp. 1294, 1305 (S.D.W.Va.1980) (violation of EHA or § 504 constitutes violation of § 1983); *Boxall v. Sequoia Union High Sch. Dist.*, 464 F.Supp. 1104, 1113 (N.D.Cal.1979) (plaintiff may sue for damages under § 1983 to enforce federal statutory rights guaranteed by the EHA and § 504).

**14.** The eleventh amendment bars recovery of money damages from the State Board for injury sustained prior to such move.

background for her later work before this court.

The total number of hours is quite substantial. While the court appreciates the high quality of the attorneys' work, it is not reasonably satisfied that the facts and issues of this case, difficult as they were, required the 824.25 hours expended. The court is reasonably satisfied, however, that 66⅔% of the total hours applied for were reasonably necessary to this specific case.

(2) *The Novelty and Difficulty of the Questions.* This is one of the first cases involving the right of a severely retarded child to an appropriate education under federal statutes. Legal and factual issues were inextricably mixed and both required intensive and original investigation. The court recognizes that the case has been both novel and difficult.

(3) *Requisite Skill.* As previously noted, the work of plaintiff's attorneys was of high caliber. Because of the difficult and novel legal and factual issues involved, the skill exhibited by plaintiff's attorneys was not only desirable but necessary.

(4) *Preclusion of Other Employment.* Although the case occupied a significant portion of the time of both attorneys, the circumstances of their regular employment make this factor insignificant.

(5) *The Customary Fee.* The affidavits submitted by counsel in this area establish that the fee requested by plaintiff's attorneys is reasonable and in line with that charged by other attorneys in this area of similar ability and experience. Defendants do not dispute this. Ms. Ivie has been admitted to the Alabama bar for five years. For the past four years she has specialized in representation of handicapped children seeking appropriate education in Alabama public schools. Mr. Varley was admitted to the Alabama bar in 1978. Prior to this time he had clerked for a federal judge in this state. Based upon these factors and the court's own knowledge of customary fees in this area, it finds the hourly rates requested by Ms. Ivie and Mr. Varley to be reasonable.

(6) *Whether the Fee is Fixed or Contingent.* The fee in this case was wholly contingent. Plaintiff's attorneys, however, have not requested an enhanced fee based on the contingency. It is on this basis alone that the court has failed to adjust the fee because of this factor.

(7) *Time Limitations.* This does not appear to be a relevant factor in this case.

(8) *Results Obtained.* Although this was not a class action, the clear purpose of this suit was to obtain a ruling which would aid large numbers of Alabama's handicapped children in obtaining an appropriate education under federal law. It succeeded in that purpose and in the court's view the results obtained were excellent.

(9) *Experience, Reputation and Ability of the Attorneys.* The experience of plaintiff's attorneys and the high quality of their work have already been noted.

(10) *The Undesirability of the Case.* In view of the nature of plaintiff's attorneys' practice, this case is not undesirable.

(11) *Length of the Professional Relationship.* This factor is not relevant in this case.

(12) *Awards in Similar Cases.* The fees requested in this case appear to be well within the boundaries marked out by other cases within this circuit. *See, e. g., Neely v. City of Grenada,* 624 F.2d 547 (5th Cir. 1980); *McNeil v. Ogburn,* 507 F.Supp. 96 (N.D.Fla.1981); *Perry v. Golub,* 464 F.Supp. 1016, 25 E.P.D. ¶ 31,488 (N.D.Ala.1980).

In light of the foregoing analysis the court approves as reasonable attorneys' fees for Ms. Ivie the amount of $24,465.00 reflecting 349.5 hours at an hourly rate of $70.00. The court approves attorneys' fees for Mr. Varley in the amount of $12,000.00 reflecting 200 hours at an hourly rate of $60.00. Telephone expenses amount to $235.18.

It is therefore ORDERED and ADJUDGED that plaintiff's said attorneys are hereby awarded fees and expenses in this cause in the total amount of $36,700.18 to be paid by defendants.