# DAMRON v. SCHOOL BOARD OF ALACHUA COUNTY
## Case No. 83-183E
State of Florida, Division of Administrative Hearing

September 26, 1984

### APPEARANCES OF COUNSEL

**Brenda Marrah, Smith, Saier and Bryant,** for petitioner.

**James F. Lang, Chandler, Gray, Lang & Haswell, P.A.,** for respondent.

### OPINION

JAMES E. BRADWELL, Hearing Officer.

Pursuant to notice, the Division of Administrative Hearings, by its duly designated Hearing Officer, James E. Bradwell, held a final hearing in this case on June 7 and 8, 1984, in Gainesville, Florida. The parties were afforded leave to submit post-hearing memoranda. Memoranda has been received by the parties supportive of their respective positions and were considered by me in preparation of this Final

Order.[1] The parties waived the time requirement that the undersigned Hearing Officer enter a Final Order within forty-five (45) days from receipt of the request for hearing as provided by Rule 6A-6.3311(5)(j), Florida Administrative Code.

## Background

By letter filed with the School Board of Alachua County, sometimes herein called the Respondent or School Board, on January 12, 1983, Rodney W. Smith, an attorney on behalf of Petitioners, requested a due process hearing generally regarding the obligation of the School Board (Respondent) to furnish Lena Susanne Damron an appropriate education. Mr. Smith later filed a motion seeking an Order waiving the forty-five (45) day rule to which Respondent filed a reply consenting to such motion, in order that the parties might attempt to effect a conciliation. On January 6, 1984, Vera Damron, Petitioner's mother, filed a letter with the Alachua County Superintendent of Schools requesting a due process hearing and advising that her attorney was Mr.Rodney W. Smith. The parties then filed a Joint Stipulation for Continuance, which was to apply to the case resulting from the January, 1983 request for due process hearing as well as the request made in January, 1984, in order that the parties might attempt to mediate and/or conciliate any disputes pending. On February 9, 1984, the undersigned Hearing Officer entered an Order granting and approving the Joint Stipulation for Continuance, thereby again waiving the forty-five (45) day time requirement. Final Hearing was scheduled for May 24, 1984, by notice of hearing dated May 10, 1984, after the parties were unable to agree upon an amicable resolution of the issues. At the outset of the hearing held on May 24, 1984, based on objection to testimony and evidence made by the Respondent because of the Petitioner's failure to disclose evidence at least five (5) days prior to the hearing in accord with Rule 6A-6.3311(g)(3), Florida Administrative Code, the Petitioner made an *ore tenus* motion to continue the hearing until June 7 and 8, which motion was granted by the Hearing Officer.

## Issue

The issue presented herein is whether or not the Respondent has provided, or offered to provide, Petitioner, Lena Susanne Damron, a free and appropriate education in accordance with the requirements of applicable law, rules and regulations.

---

[1] To the extent that the parties' proposed findings, etc. are not incorporated in this Final Order, said proposed findings, etc. were deemed either irrelevant, immaterial, or not otherwise supported by record evidence.

## Findings of Fact

Based upon my observation of the witnesses and their demeanor while testifying, documentary evidence received and the entire record compiled herein, I hereby make the following relevant findings of fact.

The Petitioner, Lena Susanne Damron (Susanne), was born June 18, 1971 and most recently has been enrolled in Gainesville Academy, a private school located in Gainesville, Florida. Susanne first enrolled in the Alachua County Public School System in the spring of 1977, when she entered kindergarten at Terwilliger Elementary School. She did not have any prior kindergarten schooling although she was enrolled in a pre-school program known as "Beginning School." Starting in the fall of 1977-1978, Susanne was enrolled at Idylwild Elementary School in the first grade. As a result of her late entry into kindergarten, Susanne missed many ofthe cognitive and perceptual motor learning experiences enjoyed by other students in her class and her kindergarten teacher's report indicated that she needed work to help develop her physical skills.

Susanne's parents were concerned about her apparent inability to read instructions, a short attention span and distractibility, which concerns were expressed to the school personnel. In October of 1977, while in the first grade, Susanne was administered a hearing and language screening test by a speech clinician for the school system which idicated above average language abilities for the first grade. Later, in December of 1977, at her mother's request and in conjunction with various school personnel, including a counselor and an exceptional student education (ESE) teacher, a Case Study Conference Report was completed. This was followed in January, 1978, by a Referral for Student Services. Susanne's parents had taken her to Shands Teaching Hospital in Gainesville for a physical examination on January 9, 1978, and in a letter addressed to Randi Elrod, a Learning Disability teacher at Idylwild Elementary School (Idylwild), dated January 9, 1978, two physicians at Shands in the Department of Neurology, reported on their examination of Susanne. The substance of that report was that Susanne was found to have a normal overall intellectual ability and reading and mathematical skills, which appeared to be within the normal range for her age and grade level. Susanne was also found to be normal based upon a neurological exam and that while her fine motor skills appeared to be somewhat delayed, the doctors reported that they expected such skills to develop in their normal process and that no manner of practice could hurry the development of such skills.

187

Susanne's parents remained concerned about her progress in school and transferred her to Archer Elementary School in the spring of 1978 during her first grade year on their belief that Susanne would benefit more from enrollment at that school.

In September of 1978, in her second grade year, Jack Carter, a counselor at Archer Elementary School, conducted several interventions with Susanne, as well as observing her in the classroom and noting her generalized incidence of distractibility and inattention to work being performed in the classroom. With the consent of the parents, Susanne was administered a psychological exam by Dr. Leonard Weiss, school psychologist, who also administered certain other tests to Susanne in addition to registering observations made of her in the classroom. The psychological evaluation was made on October 6, 1978, following the normal six week period of interventions and observations by school personnel, and on November 17, 1978, a staffing conference was held regarding Susanne's eligibility for a special education program. A few days prior to the staffing conference, Dr. Weiss met with Dr. and Mrs. Damron and informed them that based upon his psychological examination and observations, he felt that Susanne may have an emotional problem.

At the staffing conference on November 17, 1978, several representatives of the school system were present including Dr. Weiss and Mr. Carter and after general discussion by all concerned, including Susanne's parents, the recommendation was made to classify Susanne as emotionally handicapped (EH). Mrs. Damron did not agree to that classification while Dr. Damron indicated his agreement to the EH classification and acknowledged such, including the fact that he read and understood his rights as outlined in the school system's Parent Rights brochure which he had received. During the hearing herein, Dr. Damron testified that he did not agree with the EH classification contrary to his earlier agreement therewith during November of 1978.

On December 1, 1978, an individual education planning (IEP) conference was held at which various representatives of the school system were present including Dr. Damron. The IEP was written, reflecting that Susanne would receive various aspects of a special education program for her emotional handicapping condition at Archer Elementary by the ESE teacher. Again, Dr. Damron signed the IEP form and indicated his agreement with the provision of education as developed therein. Thereafter, various conferences were held with the ESE teacher at Archer Elementary during the remainder of the school term which Dr. Damron attended. At a conference held on February 7, 1979, Dr. Damron and Susanne's teachers, Dr. Weiss and Dr. Gary

188

Combs, supervisor of school psychologists, prepared a behavior management program for Susanne.

Dr. Damron felt that the ESE teachers who were instructing Susanne, were helpful to her but that he and Mrs. Damron both felt that she was not improving in her school in the manner desired by them.

Beginning in March of 1979, Mrs. Damron started considering private schools in the Gainesville area for Susanne to enroll. Following the end of the school year 1978-79, Dr. and Mrs. Damron removed Susanne from the Alachua County Public School System and in the fall of 1979, enrolled her in Gainesville Academy.

Dr. Weiss and Mr. Carter agreed with the EH classification for Susanne based on her distractibility, lack of self-motivation and her general off-task behavior. Dr. Weiss concluded that the only handicapping condition for which Susanne met all criteria under State Department of Education rules was emotionally handicapped and that she did not meet processing deficits criteria for placement in a learning disabilities program. Susanne's IEP was written on December 1, 1978, during which month the Christmas holidays take a major portion of the school days. In effect, Susanne received approximately five and a half months of special education within the Respondent's school system. Susanne's parents indicated their inclination to consider enrollment for Susanne in a private school during March of 1979. At no time during the remainder of the 1978-79 school year, after Susanne had been staffed the EH and the IEP had been written for her, did her parents ever request a re-evaluation of her handicapping condition or a review of her IEP. Nor did the parents request or initiate a due process hearing for the purpose of objecting to such classification and the IEP.

Dr. and Mrs. Damron enrolled Susanne in a summer program at P.K. Yonge School in Gainesville following the completion of her second grade at Archer Elementary School. In September of 1979, Susanne was enrolled in a third grade class in Gainesville Academy. Gainesville Academy is a private school which generally educates children who are having various kinds of learning problems and are not learning in accordance with their intellectual ability. Gainesville Academy does not formally comply with requirements of Public Law 94-142 and it has not written any IEPs for Susanne. The program for students at Gainesville Academy does not concern itself with State Board of Education criteria pertaining to various kinds of handicapping conditions and the school does not assign classification or labels such as SLD or EH to its students. The school, although not accredited, provides students with more individualized instruction because the

189

classes are generally small and the teachers strive to remediate particular problems which individual students have. There is no "mainstreaming" as such since the students are always contained in small classes with other students who have various kinds of academic problems. (Testimony of W. Schmidt, the Principal of Gainesville Academy)

During the summer of 1980, after Mrs. Damron made a request for formal evaluation of Susanne by the School Board, various tests, including a psychological evaluation, were administered to Susanne by a school psychologist.

Reports from the Department of Occupational Therapy at the University of Florida, College of Health Related Professions, had been furnished to school personnel indicating that Susanne, in the summer of 1978, was found to have mild to moderate sensory integration dysfunction and that she had been receiving services of occupational therapy through the Department of Occupational Therapy.

On July 17, 1980, an eligibility staffing conference was held and those attending included Dr. and Mrs. Damron, their attorney, Dr. Linda Stevens, ESE Director, and various other members of the school system. After evaluating the various reports and psychological evaluatios, a Case Study Conference Report indicated that Susanne qualified for ESE eligibility in that she suffered process deficits in visual processing areas and only barely met the State Board of Education criteria for eligibility in math. The recommendation was then made that she be classified specific learning disability (SLD) with support services of occupational therapy and that she be rezoned to Metcalfe Elementary School in order to be served by both an SLD program and an occupational therapist, Metcalfe being the only regular elementary school in the system which offered occupational therapy services. Mrs. Damron disagreed with that recommendation because of Susanne's assignment to Metcalfe and the IEP conference was postponed until such time as Mrs. and Dr. Damron could visit Metcalfe and talk with the principal.

Following their discussion with the principal at Metcalfe, an IEP conference was held on August 19, 1980. As a result of that conference, and following consideration of all the records and psychological evaluations, a proposed IEP was prepared for Susanne which would provide her with two hours of SLD program daily plus two to three 30-minute sessions of occupational therapy per week. During the remainder of the school day, Susanne would be mainstreamed in the regular program. All members of the school multi-disciplinary team agreed that with that two hours per day recommendation and the ESE

190

program for Susanne's mildly handicapping condition, Susanne would be mainstreamed for the remainder of the day except when she would be receiving occupational therapy. It was explained to Dr. and Mrs. Damron that after a few weeks in the program as proposed, the number of hours per day in the SLD program could be increased or decreased based upon her needs as developed in the program.

Dr. and Mrs. Damron did not agree with the proposed IEP because they felt she needed more time per day in the SLD program; that the occupational therapist was not properly certified or qualified to render treatment to Susanne because she was not certified in the administration of the Southern California Sensory Integration Test; the placement would be at Metcalfe Elementary School rather than the school to which she would normally be zoned and the two hours per day in the SLD program would be spent in a resource room in conjunction with children suffering from varying exceptionalities as opposed to a totally self-contained room for only students with specific learning disabilities.

The teaching of Susanne by Ms. Dyce in the program as proposed by Respondent, would have occurred in a small group of approximately five to six other students. Ms. Dyce would have taught Susanne for five (5) hours a day in the SLD program if her condition warranted such expensive teaching. During the 1980-81 school year, the school system did provide self-contained or full-time programs to thirteen (13) SLD students.

It is true that the occupational therapist who would have administered therapy to Susanne was not certified to administer the California Sensory Integration Test however Susanne had already received that test and had been designated as having sensory integration dysfunction. The test results were included in the psychologist's report and the occupational therapist at Metcalfe was properly licensed and qualified to administer the occupational therapy.

Dr. and Mrs. Damron, having disagreed with the proposed IEP or to sign the consent for placement of Susanne as proposed by the Respondent, kept Susanne enrolled at Gainesville Academy. The Damrons did not request or in any way initiate a due process hearing to challenge the proposed placement and the IEP even though they were advised of their rights to do so by Dr. Stevens at the IEP conference while their attorney was present. Additionally, the Damrons thereafter initiated complaints with the State Department of Education both during the summer of 1980 and on approximately February 26, 1981. On both of those occasions, the Damrons were advised of their rights to request a due process hearing in accord with the appropriate state

**191**

board rules. (Correspondence from Dr. Landis M. Stedler, Chief, Bureau of Education for Exceptional Students, State Department of Education, and Dr. Wendy M. Cullar, Chief, Bureau of Education for Exceptional Students, State Department of Education) As stated, no request for a due process hearing was ever initiated by Dr. and Mrs. Damron until January, 1983, when their attorney, Rodney Smith, did so on their behalf.

On August 30, 1982, Mrs. Damron requested from Dr. Magann, Superintendent of Schools, an SLD staffing conference for Susanne. As a follow-up, the school district received information and input from teachers at Gainesville Academy where Susanne had been enrolled as well as a copy of the test scores for Susanne from the Mailman Center in Miami. A school psychologist, Petty Andress, conducted a psychological evaluation of Susanne and administered other tests to her on October 28, 1982, after having received a Parent Consent form on October 18, 1982. A staffing conference was held on November 8, 1982 at which various district personnel were present including Dr. and Mrs. Damron and two teachers from Gainesville Academy. As a result of that conference, a report was written on that date indicating non-eligibility for placement in a special education program. Susanne failed to meet the school board of education criteria for classification for SLD for two reasons. There were no significant process deficits sufficient to meet state criteria and her test scores, when compared to the full-scale IQ test score obtained from the Mailman Center, for both reading and math, did not meet state board criteria.

Dr. and Mrs. Damron did not agree with the staffing report, Mrs. Damron refused to sign the report and stated that the school personnel had refused to override the state board guidelines in order to allow Susanne eligibility in the school district's SLD program. The staffing report indicates that after the determination of ineligibility was made, other alternatives were discussed for Susanne including the option of alternative education and enrollment in a Chapter I program. On November 24, 1982, Dr. Lilly Shaw, Assistant Superintendent for Student Support Services attended the staffing conferences and wrote to Mrs. Damro reiterating that Susanne had not met criteria for placement in an ESE program. She also offered several alternative educational settings which might be beneficial for Susanne. Dr. and Mrs. Damron did not enroll Susanne in the public school system and Susanne remained at Gainesville Academy.

During the 1983-84 school year, Dr. Damron took sabbatical leave from the University of Florida and studied the poultry business in the Hall County, Georgia area. Susanne was enrolled in the Hall County

school system and she received education (in Hall County) in the SLD program. A review of the documents introduced and the testimony adduced during the hearing revealed that Mrs. Damron did not provide the Hall County school system with all of the relevant material including the fact that Susanne had, in the past, been determined ineligible for SLD education services with occupational therapy benefits. These determinations had been made during 1978, 1980 and 1982. Susanne was enrolled in a self-contained SLD program at South Hall Junior High in Hall County, Georgia from September of 1983 through December of 1983. The Damrons felt that Susanne benefited from the program offered her at South Hall while she was enrolled there.

The Damrons returned to Gainesville in early January, 1984 and Susanne was reenrolled in Gainesville Academy. Mrs. Damron spoke to Dr. Linda Eldridge, District Director of ESE on January 6, 1984 in an attempt to find out what the school system intended to do respecting a placement for Susanne. On January 6, 1984, Mrs. Damron also filed a letter request with the Superintendent requesting a due process hearing. Dr. Eldridge and Linda Cantrell, Staffing and Placement Supervisor for ESE students in the Alachua County school system, sought information from Mrs. Damron regarding Susanne's enrollment during the fall of 1983. It was not until they received copies of the Hall County, Georgia IEP on May 7, 1984 that Respondent became aware of Susanne's placement during the fall of 1983. After some discussion with the Damron's attorney and officials from the Hall County, Georgia school system, a release of information was provided by the Damrons and the Respondent's school system received the records relied upon by the Hall County, Georgia school system to effect the SLD placement of Susanne during September of 1983.

A review of the information submitted by the Damrons to the Hall County school system indicates that such data was incomplete, did not contain an IEP and omitted certain other relevant factors which would have been helpful to the Hall County, Georgia school system in effecting a placement for Susanne.

Respondent's school system has offered to transfer Susanne into an SLD program based upon the temporary staffing and IEP made at Hall County even though Respondent was concerned about the information presented to Hall County. (Testimony of Dr. Eldridge, the then-director of the Alachua County Exceptional Student Education Department) Additionally, Respondent has offered to match the special educational program offered and received by Susanne in Hall County although Respondent would necessarily, immediately conduct a reeval-

**193**

uation to determine whether the temporary SLD placement should be made permanent.

A student suffering from mild motor problems, as Susanne is suffering, is difficult to distinguish and categorize in terms of the level of special services needed. That disability is considered by experts to be the least predictive of all learning disabilities. In many cases, development of the student suffering with mild motor problems is a matter of simple maturation, such problems tending to disappear as maturation occurs. (Testimony of Dr. Cecil Mercer, a Special Education professor in the College of Education, University of Florida, and received as an expert herein in special education and learning disabilities)

## Conclusions of Law

1. The Division of Administrative Hearings has jurisdiction over the subject matter and the parties to this action. Sections 120.57(1) and 230.23(4), Florida Statutes.

2. The parties were duly noticed pursuant to the notice provisions and requirements in Chapter 120 and 230, Florida Statutes.

3. Section 230.23(4)(m), Florida Statutes, provides in pertinent part that the School Board shall:

provide for an appropriate program or special instruction, facilities, and services for exceptional students as proscribed by the state board as acceptable, including provisions that: . . .

4. No student be given special instruction or services as an exceptional student until after (s)he has been properly evaluated, classified, and placed in the manner proscribed by rules of the state board. The parent or guardian of an exceptional student evaluated and placed or denied placement in a program of special education shall be notified of each such evaluation and placement or denial. Such notice shall contain a statement informing the parent or guardian that he is entitled to a due process hearing on the identification, evaluation, placement or lack thereof . . . .

5. In providing for the education of exceptional students, the superintendent, principals and teachers shall utilize the regular school facilities and adapt them to the needs of exceptional students whenever this is possible. No student shall be segregated and taught apart from normal students until a careful study of the student's case and evidence has been obtained which indicates that segregation would be for the student's benefit or is necessary because of difficulties involved in teaching the student in a regular case.

194

4. Competent and substantial evidence was offered herein to establish that the Respondent, Alachua County School Board, has provided, or offered to provide the Petitioner, Lena Susanne Damron, an appropriate education in accordance with the applicable requirements of law, rules and regulation. In this regard, evidence reveals that the school system properly evaluated and made steps to classify and place the Petitioner in a program where her needs were satisfied in the least restrictive environment as required by law. 45 C.F.R. Sec. 121a.550; Section 230.23(4)(m)5, Florida Statutes. Further, Susanne's interaction with non-handicapped children will be a positive social experience and she could benefit from mainstreaming. See, *In re: Milpitas Unified School District*, 3 EHLR 503:254, 255 (1982). It is well-settled that a school district program need not match or surpass a particular program offered by a private school. *In the Matter of the City of School District of New York v. Michael K.*, 3 EHLR 501:141, 142 (1978). Having concluded that the program offered by Respondent is appropriate and, if implemented, is in the least restrictive environment, Respondent is not further obligated to offer the best possible education. *Springdale School District v. Grace*, 494 F.Supp. 266,272 (1980).

Finally, Chapter 20 U.S.C., Section 1415(e)3, requires, absent a mutual agreement, that a child continue in the current placement during pendency of a due process review proceeding. *Stuart v. Nappi*, 443 F.Supp. 1235, 1241 (1978). The Respondent is therefore not obliged to reimburse the Damrons for tuition and related expenses connected with their withdrawal of Susanne from the public school system and unilateral enrollment of her in the private school, Gainesville Academy.

## Order

Based on the foregoing findings of fact and conclusions of law, it is ORDERED:

That the Respondent has provided, or offered to provide Petitioner Lena Susanne Damron, an appropriate education in accordance with Chapter 230, Florida Statutes, and applicable rules and regulations.

It is further ordered that, in accordance with the agreement of Respondent to transfer Susanne into a special education program in the district, comparable with the classification and special educational program she was receiving under the IEP written in Hall County, Georgia, the School Board shall enroll her in such a special education program, if requested to do so by the Petitioners, all in accord with applicable rules and regulations.