CHRIS D. and Cory M., etc., Plaintiffs,

v.

MONTGOMERY COUNTY BOARD OF EDUCATION, et al., Defendants.

Civ. A. No. 89–T–1165–N.

United States District Court, M.D. Alabama, N.D.

Dec. 13, 1990.

Patricia E. Ivie, Robert J. Varley, Legal Services Corp of Ala., Montgomery, Ala., for plaintiffs.

Vaughan H. Robison, Justice D. Smyth, III, Montgomery, Ala., for defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

In this action, plaintiff Cory M.,[1] an emotionally disabled student, charges that defendant Montgomery County Board of Education has failed to provide him with the "free appropriate public education" to which he is entitled under the Education of the Handicapped Act ("EHA"), 20 U.S.C.A. §§ 1401 *et seq.*[2] Cory's parents have brought this lawsuit on his behalf.[3] Based on the evidence presented, the court holds that the board has not satisfied the educational requirements of the EHA.[4] The court concludes that the board must implement a new "Individualized Educational Program" for Cory, and must also provide, as a related service, appropriate counseling and training for his parents.

## I. BACKGROUND

Cory is a 13–year old boy who is currently in the fifth grade in the Montgomery County public school system. Since he entered the system as a first-grader in 1983, Cory has achieved little academically and has exhibited severely disruptive behavior. Nevertheless, he was not evaluated to determine if he was educationally handicapped until 1987, and only began receiving special education in 1989. Cory's parents allege that the school board has violated a number of procedural and substantive requirements of the EHA. The essential dispute in this case revolves around whether Cory is receiving educational benefit from his current placement or whether significant changes in his educational program along with related services are necessary to provide him with a "free appropriate public education," as required by the EHA. However, Cory's previous schooling and performance are relevant to determining whether, under the EHA, school system officials are adequately serving his present educational needs. Therefore, the court turns first to Cory's background as a stu-

1. At Cory's request, his full name has been filed under seal with the court.

2. This case was initially filed by another disabled child, Chris D. Cory was added in an amended complaint, in which both plaintiffs also sought to have the court certify the lawsuit as a class action. Chris's case has already been heard by the court, and the court has entered an order requiring the board to place Chris in a full-time residential school. *See Chris D. v. Montgomery Cty. Bd. of Educ.*, 743 F.Supp. 1524 (M.D.Ala.1990). The court has not yet reached the issue of whether a plaintiff class should be certified.

3. Cory's parents have also named as defendants the superintendent and special education coor-

dinator for the Montgomery County schools. However, because the superintendent and special education coordinator are sued in their official capacities only, the court does not treat them separately but rather refers to all three defendants as the Montgomery County Board of Education.

4. Cory also rests his claim under § 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. § 794. Because the court concludes that the board has violated Cory's rights under the EHA, it is unnecessary to decide whether he has a claim under the Rehabilitation Act. *See note 44, infra.*

dent in the Montgomery County public schools.

### A. Prior to the 1988–89 School Year

Cory experienced problems from the time he entered the first grade at Patterson Elementary School in Montgomery in September 1983. He failed all his major academic subjects and was required to repeat the first grade. Although Cory was promoted to a higher grade after each of the following three school years, he continued to receive failing marks in virtually all his academic courses. Moreover, Cory's conduct grew progressively worse during this period. By the third grade, his conduct marks had deteriorated from poor to failing.

School system officials, however, did not evaluate Cory to determine whether his difficulties in school might be attributable to an educational handicap until 1987, as he was completing the third grade. When a team of special education personnel did evaluate him in June of that year, they considered only whether he might be educably mentally retarded, despite the fact that his test results and school records suggested he suffered instead from an emotional disability.[5] The committee determined that Cory was not retarded and concluded he was not entitled to special education.[6]

Thus instead of receiving special education, Cory was promoted to the fourth grade and attended Davis Elementary School during the 1987–88 school year. Again, Cory received failing grades in most academic areas, exhibited poor conduct, and was held back to repeat the fourth

grade the following year. School system officials did not reevaluate Cory that school year and did not provide him with any special education.

### B. The 1988–89 School Year

Cory's disruptive behavior grew even more severe in the early weeks of his second year in the fourth grade at Davis Elementary School. During the first semester of the 1988–89 school year, Cory was repeatedly disciplined by his teachers and principal for verbal abuse, hitting other students, and refusing to follow directions, and was ultimately suspended several times for misconduct.[7] Cory also continued to have academic problems, despite the fact that he was repeating a grade.

In October 1988, Cory's parents asked school system officials to reevaluate Cory to determine whether he had an educational handicap entitling him to special education. In November 1988, after an evaluation of Cory, a committee of special education personnel concluded that he was educably mentally retarded. In January 1989, Cory's teacher proposed a written "Individualized Education Program," also known as an "IEP," for him at a meeting with Cory's mother and her attorney.[8] None of the officials who had evaluated Cory were present at this meeting, nor were any special education supervisors. The IEP adopted at this meeting called for him to be placed in a class exclusively for educably mentally retarded students at Davis Elementary School, and established

---

5. Mental retardation is one of several handicaps covered by the EHA. *See* 20 U.S.C.A. § 1401(a)(1). Educably mentally retarded children have an extremely low capacity for learning. This condition is characterized not so much by misbehavior as by a mental deficiency in both "intelligence quotient" (I.Q.) and "adaptive community behavior," two related measures of intelligence. The evidence reflects that school officials should clearly have been alerted that Cory's problems in school were not caused by mental retardation, by the fact that Cory scored high in adaptive behavior, but low in I.Q., as well as by the fact that his scores on the different skill components which together constitute I.Q. varied greatly.

6. There are no records indicating that Cory's parents were ever notified about this evaluation.

7. On one occasion, the principal called police to the school and sought to press criminal charges against Cory.

8. The EHA requires school system officials, in cooperation with a handicapped child's parents, to formulate and implement an adequate, written IEP for each child. The Act details how an IEP should be developed and formatted. The court discusses these requirements and the legal standards for determining whether the school system has satisfied them in Cory's case in Section II of this opinion.

certain generic academic goals for Cory.[9]

In February 1989, Cory's parents told school system officials that they objected to the IEP adopted for Cory as well as to the evaluation and placement of Cory as educably mentally retarded.[10] In February, at his parent's urging, school system officials agreed to reclassify Cory as both educably mentally retarded and emotionally conflicted, but made no changes in Cory's IEP. However, because Cory had continued to exhibit disruptive behavior at Davis Elementary School, school officials transferred him to a class for educably mentally retarded students at Fews Elementary School, where he remained until the end of the 1988–89 school year. Cory again suffered conduct problems at his new school, although his grades improved somewhat and he was promoted to the fifth grade.

In July 1989, Dr. Larry Martin, a professor of special education, was retained by Cory's parents to evaluate Cory. In a report submitted to the board's special education coordinator, Dr. Martin concluded that he was not mentally retarded, and instead recommended that Cory be placed in a "self-contained" classroom for emotionally conflicted children.[11] At the urging of Cory's parents, school system officials classified Cory as emotionally conflicted and not educably mentally retarded, and agreed to place him in a class designated for emotionally conflicted or learning disabled students at Dalraida Elementary School for the 1989–90 school year.[12]

## C. The 1989–90 School Year

Although it began on a positive note, the 1989–90 school year proved an extremely difficult one for Cory. In September 1989, Cory's teacher wrote a new IEP for him, which was adopted at a meeting among herself, Cory's mother, and a special education supervisor.[13] Like Cory's previous IEP's, the new plan included only broad, generic objectives and vague methods for monitoring Cory's progress.[14] Moreover,

9. As a written document, this IEP, like other ones later adopted for Cory, consisted of two parts. The first was a pre-printed form, with a heading for "special goals and objectives," and space for other related information beside it. However, despite the specificity suggested by this heading, the information included for Cory was far from individualized. One typical objective read simply: "Student will participate in reading activities in the regular classroom," and indicated which reading textbook Cory would use. The second part of the IEP also consisted of several pre-printed pages, which listed various more specific-sounding "objectives" or "competencies," such as, "the student will be able to: Read and write numbers 0–999," each followed by the phrase "with ___% accuracy." On Cory's forms, the teacher simply filled in each blank with a number. There is no indication on these forms how the teacher arrived at these numbers. *See* Administrative Hearing of December 15, 1989, Petitioner's Exhibits, Volume 1, at 40–62.

10. In a February 1989 letter to school system officials, the attorney representing Cory's parents indicated that Cory's records suggested he might be suffering from a learning disability or an emotional problem known as "emotional conflict" or "serious emotional disturbance." *See* Administrative Hearing of December 15, 1989, Petitioner's Exhibits, Volume 1, at 64. Both of these conditions are considered handicaps under the EHA. *See* 20 U.S.C.A. § 1401(a)(15). The characteristics of these educational handicaps are discussed in Section II of this opinion.

11. The educational term "self-contained" refers to a classroom containing only handicapped children.

12. Although Cory's records do not state it explicitly, both sides apparently agree that Cory is not only emotionally conflicted, but suffers from an additional handicap: He is learning disabled in math and possibly other subjects as well.

13. Cory's new teacher was certified to teach children with learning disabilities, but was not certified to teach emotionally conflicted children.

14. For example, the first objective in Cory's new IEP, provided, in standard form: "The student will maintain a/an ___% average in math on the 3rd grade level," with "80" written in the blank space, and stated that Cory would be evaluated by reference to his "Daily work" and "Chapter tests." The IEP also provided that Cory would be "mainstreamed"—that he would attend regular classes—in several subjects, including Health, Art, Physical Education, Music, and Social Studies. *See* Administrative Hearing of December 15, 1989, Petitioner's Exhibits, Volume 2, at 113–115. Finally, a supplement to the IEP also consisted of several pre-printed pages which listed various more specific-sounding "objectives" or "competencies," such as "The student will be able to: Identify periods to punctuate sentences with ___% accuracy," with the

despite Cory's extensive record of behavioral difficulties, the new IEP, like those before it, contained no mention of any goals or techniques for teaching Cory to control his conduct.[15] Finally, although Cory's teacher arranged for parents each day to receive notes, to be signed and returned, which would indicate generally whether each student had performed his work or misbehaved, she made no other formal efforts to involve Cory's parents in educating him or helping to control his behavior.

The absence of any program for addressing Cory's behavior had a telling effect as early as late September 1989, when Cory began to manifest more severe social and emotional problems than ever before. On repeated occasions, Cory cursed at teachers, refused to sit in his seat or stop shouting, tried to run away from school, and physically threatened other children and adults. Although school officials made various efforts to control him, including pulling him out of regular classes, locking him in the classroom, calling his parents in for conferences, and assigning him to sit in the office with a special "crisis" teacher, Cory's misbehavior escalated through the second six weeks of the school year. He attacked other students on several occasions, and teachers and staff repeatedly considered it necessary to restrain him physically.[16] In early November 1989, school system officials instructed Cory's parents to keep him out of school until further notice.

Cory returned to class at Dalraida in January 1990. Again, as was the case early in the school year, Cory's conduct and school work initially improved. Indeed, he received C's and D's as his final marks for the year in most academic subjects. However, as the spring wore on, his acts of misbehavior again grew more frequent and serious. During the latter part of the school year, Cory again began to threaten physically teachers and students, curse and use obscene gestures, refuse to work or obey directions, and assault other students. In April 1990, apparently in light of Cory's growing misbehavior, school officials reassembled a "security desk" in which, on several occasions earlier in the school year, Cory had been physically confined.[17] Cory's behavior deteriorated in spite of the fact that Cory's teacher had, in February 1990, modified Cory's IEP on her own to include, for the first time, certain general behavioral goals and objectives.[18]

### D. The 1990–91 School Year

Although he began the new school year without much incident, in recent weeks Cory's misbehavior has begun to worsen. Again, he has hit other students, cursed at teachers and peers, refused to obey directions, and left the room without permission. *See* Respondent's Exhibit 3. His new teacher has not departed significantly from his previous teacher's methods for attempting to teach Cory and control his

figure, "80," again written in. The supplement also indicated that Cory would be evaluated by means of "unit tests." *See* Plaintiff's Exhibit 4, at 59–68.

**15.** Cory's teacher did issue to all parents of children in her class a written, general "discipline policy." This included such rules as "Students will obey the adults in charge" and "Students will conduct themselves appropriately at all times." It also provided, for example, that students who broke class rules would lose free time or other privileges and that if a student continued to behave inappropriately, he would be sent to the principal's office. *See* Administrative Hearing of December 15, 1989, Petitioner's Exhibits, Volume 2, at 117.

**16.** On November 1, Cory threatened to kill his teacher's daughter and, at the teacher's request,

the police were called and charges were brought against Cory.

**17.** In January 1990, a new IEP had been adopted for Cory which was identical to the one from September 1989, except that it provided that he would not be mainstreamed and would be restrained in the security desk when necessary. *See* Plaintiff's Exhibit 4, at 1–7.

**18.** The behavioral objectives and methods of evaluation adopted by Cory's teacher were as generalized as the academic provisions of Cory's IEP. One typical objective read: "Cory will ignore other children when they exhibit inappropriate behavior," provided for evaluation by "teacher observation," and required a "100%" degree of mastery. *See* Defendant's Exhibit 2.

behavior.[19] Recent standardized achievement tests taken by Cory indicate that he has made no substantial academic progress since 1987, before he began receiving special education.

### E. The Due Process Hearing

In December 1989, a due process hearing was conducted, as requested by Cory's parents, to examine whether the school board's treatment of Cory violated the EHA. At the hearing, Cory's parents argued that the board had improperly identified, evaluated, and placed Cory, contrary to the requirements of the EHA. They asked the hearing officer to order the board to pay an independent consultant selected by them to develop an appropriate IEP for Cory and to train and instruct teachers and staff in how to implement such an educational program. Cory's parents also requested that the school board be required to provide them with counseling and other services to enable them to help manage Cory's behavior and contribute to his education.[20] The board responded that it had satisfied the EHA because Cory was receiving "some educational benefit" from his current program. The board also argued that its teachers and staff were already adequately trained and that school system officials had made sufficient efforts to involve Cory's mother in his education.

■ The hearing officer determined that the school board was not providing Cory with a free appropriate public education as required by the EHA. He found that the school system's teachers and staff had failed to identify Cory's handicap in a timely manner or to develop and implement an appropriate, legally adequate educational program for Cory. He also suggested that these personnel lacked the ability to develop a program to address Cory's educational needs. The hearing officer ordered school system officials and Cory's parents to arrange an independent evaluation to be used in formulating a new IEP.[21] Subsequently, the school board agreed to pay Dr. Howard Knoff, the outside consultant retained by Cory's parents in this case, to develop an IEP for Cory. However, the hearing officer did not order the school board to implement the recommendations of this expert in developing a new IEP for Cory, and did not address Cory's parents' requests for training of teachers and staff and counseling for themselves.[22] Cory's parents have brought this action under the EHA challenging the hearing officer's deci-

**19.** Cory's new teacher received her college degree and teaching certificate only several months ago, and has virtually no previous teaching experience.

**20.** Cory's parents do not object to his present placement in a self-contained classroom at Dalraida Elementary School.

**21.** The hearing officer also ordered the school board to pay Cory's parents for any past independent evaluations whose results were furnished to school system officials, and indicated that Cory should return to his class at Dalraida Elementary School.

**22.** The board's contention that the court lacks jurisdiction over this lawsuit because Cory's parents "prevailed" in a due process hearing is without merit. Because Cory's parents did not receive from the hearing officer all the relief they requested, they are "aggrieved" parties" under the Act, 20 U.S.C.A. § 1415(e), and are entitled to bring this court action. *See Doe v. Alabama State Dep't of Educ.,* 915 F.2d 651, 659–60 (11th Cir.1990).

The court also rejects the board's suggestion that this lawsuit is time barred. The administrative hearing officer's decision in this case was entered on December 20, 1989, and Cory's parents filed this action in the form of an amended complaint on January 24, 1990. Defendants contend that the court should apply Alabama's 30–day statute of limitations for administrative appeals as the most analogous limitations period. No Eleventh Circuit cases discuss this issue. However, several other circuits have rejected such an argument, finding that other similarly short state statutes of limitations were inconsistent with the policies underlying the Act. *See Schimmel v. Spillane,* 819 F.2d 477 (4th Cir. 1987); *Janzen v. Knox Cty. Bd. of Educ.,* 790 F.2d 484 (6th Cir.1986); *Scokin v. Texas,* 723 F.2d 432 (5th Cir.1984); *Tokarcik v. Forest Hills Sch. Dist.,* 665 F.2d 443 (3rd Cir.1981), *cert. denied,* 458 U.S. 1121, 102 S.Ct. 3508, 73 L.Ed.2d 1383 (1982). Moreover, even if this court were to apply the 30–day statute of limitations requested by defendants, this lawsuit would still not be time barred, because there is no evidence that Cory's parents could reasonably be expected to have had notice of such a deadline. *See Spiegler v. Dist. of Columbia,* 866 F.2d 461 (D.C. Cir.1989).

sion. *See* 20 U.S.C.A. § 1415(e)(2). As required by the EHA, the court has read the record of the administrative proceeding and conducted a trial at which each side has presented additional evidence. The court must now decide whether the claim filed by Cory's parents has merit and, if so, what relief is appropriate.

## II. LIABILITY

■ The EHA provides federal funds to assist state and local governments in educating handicapped children. In order to receive money, states are required to provide a "free appropriate public education" to all disabled children within their jurisdictions. 20 U.S.C.A. § 1412(2)(B). Towards this end, the Act confers on handicapped students both procedural and substantive rights. *Honig v. Doe*, 484 U.S. 305, 309, 108 S.Ct. 592, 596–97, 98 L.Ed.2d 686 (1988). As to the former, "the Act establishes a comprehensive system of procedural safeguards designed to ensure parental participation in decisions concerning the education of their disabled children and to provide administrative and judicial review of any decisions with which those parents disagree." *Id.* at 308, 108 S.Ct. at 596.

Cory's parents, however, do not rely on the Act's procedural guarantees in demanding that the board adopt a new IEP for Cory and provide supplementary training and counseling.[23]

Rather, at issue in this case are the two complementary substantive rights which a disabled student has under the Act. First, a disabled student has a right to "personalized instruction with sufficient support services to permit the child to *benefit educationally* from that instruction."[24] *Hendrick Hudson Central Sch. Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 203, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982) (emphasis added); *Doe v. Alabama State Dep't of Educ.*, 915 F.2d 651, 665 (11th Cir.1990). Second, a disabled student has a right to be "mainstreamed"—that is, placed in the "least restrictive environment" possible. *Martinez v. Sch. Bd. of Hillsborough Cty.*, 861 F.2d 1502, 1505 (11th Cir.1988).[25] Upon reviewing the evidence, the court concludes that Cory's current educational program violates both these substantive obligations.

### A. Educational Benefit

■ Cory's parents presented extensive expert testimony from Drs. Howard

---

**23.** Cory's parents do claim that the school board has violated certain of the Act's procedural requirements by, for example, failing to identify and evaluate Cory in a timely manner, and failing to follow the statutory process for developing several of Cory's IEP's that are no longer in effect. These matters are of course relevant to the ultimate issue of Cory's present educational situation. Indeed, the court recognizes that the failure of the board's special education personnel to evaluate and address properly Cory's handicaps earlier has aggravated his educational problems; even with intensive intervention, Cory's parents probably cannot hope to see the kind of improvement they might have expected had school system officials intervened when he was younger. However, the court does not have the capacity now to grant prospective relief from past procedural violations. Moreover, because the hearing officer in this case determined that the school board had in fact failed to identify and evaluate Cory promptly, and that the board also unlawfully failed to require special education personnel other than Cory's teacher to participate in the January 1989 IEP meeting, Cory's parents cannot truly be said to be "aggrieved" as to these findings.

**24.** The "primary vehicle" for delivering this personalized instruction is the "individualized educational program" or IEP. *Honig,* 484 U.S. at 311, 108 S.Ct. at 597. The IEP "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives. [20 U.S.C.A.] § 1401(19)." *Honig,* 484 U.S. at 311, 108 S.Ct. at 597. The Act requires that an IEP be developed for each disabled child and that it be the product of a meeting between a representative of the local school district, the child's teacher, and the child's parents or guardian. § 1401(19). The IEP must be reviewed and, if necessary, revised, at least once a year. A parent or guardian who disagrees with a child's IEP may seek administrative review and, if that proves unsatisfactory, may file suit in a federal or state court. § 1415(b), (c), (e)(2).

**25.** Under this requirement, a handicapped child may be removed from the regular classroom setting "only when the nature or severity of the handicap is such that education in regular class with the use of supplementary aids and services cannot be achieved satisfactorily." *Id., quoting* 20 U.S.C.A. § 1412(5)(B). *See also Honig,* 484 U.S. at 311, 108 S.Ct. at 597.

Knoff and George Batsche, two nationally-recognized specialists in the field of child psychology with particular expertise and experience in the education of emotionally conflicted children.[26] These experts had several opportunities to observe Cory's classroom at Dalraida; interview his teachers and special education staff, and examine their instructional materials; evaluate Cory's educational records; and independently assess Cory himself. According to both Knoff and Batsche, the methods currently used by school system officials to educate Cory utterly fail to provide him any significant educational benefit and in fact may be harming him. These expert opinions are borne out by evidence that Cory's behavior and academic performance have shown no improvement and in some respects have deteriorated since he began receiving special education.[27] The board presented no credible expert testimony to contradict the findings and conclusions of Knoff and Batsche.[28]

Both experts testified that any program for educating an emotionally conflicted child must, at a bare minimum, aim to teach the child to control his own behavior and to work independently on school assignments; however, instead of addressing these needs, school system officials have only rendered Cory more dependent on constant, one-on-one teacher supervision. The Supreme Court has made clear that one of Congress's principal intentions in passing the Act was "that handicapped children be enabled to achieve a reasonable degree of self-sufficiency." *Rowley*, 458 U.S. at 201 n. 23, 102 S.Ct. at 3048 n. 23.[29] Although Cory has reached the age where he must soon enter junior high school, the board's special education personnel have made no efforts to enable him to work without a teacher perpetually standing over him or to control his own behavior in the absence of

26. Both Knoff and Batsche are school psychology professors at the University of South Florida, and have frequently lectured, served as consultants to school districts, and published on the subject of the educational needs of emotionally conflicted students throughout the country.

27. Although school system officials do not violate the EHA simply because a child fails to make reasonable or expected progress, 20 C.F.R. § 300.349, "actual educational results are relevant" to determining whether a child has received educational benefit, as required by the Act. *Roland M. v. Concord Sch. Committee*, 910 F.2d 983, 991 (1st Cir.1990) ("Congress indubitably desired 'effective results' and 'demonstrable improvement' for the Act's beneficiaries").

28. The school board presented testimony from Cory's teacher last year and his current teacher. Although both are personally acquainted with Cory, neither has any significant expertise in child psychology or the area of emotionally conflicted children; Cory's previous teacher is not even certified to teach emotionally conflicted children and his new teacher only received her B.A. this year and has virtually no teaching experience. Similarly, a third witness called by the board has also never taught nor been certified to teach emotionally conflicted children. The board's fourth witness and apparently the only one proffered as an expert in this area was formerly a special education supervisor for the Montgomery County school system and, since August 1990, an "emotional conflict specialist" for the special education division of the Ala-

bama Department of Education. Although she has a Master's Degree in Special Education, the court cannot treat her testimony regarding Cory and the needs of emotionally conflicted children in general as expert for several reasons. First, she received her master's in 1976 and her curriculum vitae does not indicate she has in any way remained current with developments in this field. Second, her own testimony raised serious questions about her expertise and credibility. Although she categorically asserted that Cory had recently made behavioral and academic progress, she was unable to articulate any basis for her opinion other than Cory's passing grades, and her testimony revealed that she was unfamiliar with any of the specifics of Cory's educational record. Moreover, she was a direct participant in a 1988 meeting in which Cory was mislabeled as mentally retarded. Finally, she also testified that she saw nothing wrong with the fact that Cory's previous teacher taught emotionally conflicted children although she was not certified in this area.

29. *Accord* S.R.Rep. No. 94–168, 94th Cong., 1st Sess. 9, *reprinted in* 1975 U.S.Code Cong. & Admin.News 1425, 1433 ("with proper education services, many [handicapped children] would be able to become productive citizens, contributing to society instead of being forced to remain burdens"); *Campbell v. Talladega Cty. Bd. of Educ.*, 518 F.Supp. 47, 54 (N.D.Ala.1981) (handicapped student's educational program failed to satisfy EHA because "it is ill-suited to impart to [him] any functional or communicative skills which might ... increase his independence").

continuous adult restraint.[30] Without some training in these areas, Cory cannot ever hope to succeed in a regular classroom or in the outside world.[31]

### i. Academics

The academic objectives and methods of evaluation found in Cory's most recent "Individualized Educational Program" are, like those included in previous IEP's, inadequate in at least two principal respects.[32] First, it is obvious from the face of the documents comprising the IEP that it is not truly "individualized"—in other words, it is not tailored to Cory's particular needs and abilities. *See* 20 U.S.C.A. § 1401(a)(16)–(19) (handicapped student entitled to "specially designed instruction to meet [his] unique needs"); *Honig*, 484 U.S. at 311, 108 S.Ct. at 597 (IEP should describe "specially designed instruction" to be provided handicapped child). The IEP consists of several standard, pre-printed forms on which Cory's teacher from last year has merely filled in grade levels, percentages, and textbook names. *See* Plaintiff's Exhibit 4, at 1–7, 58–69. Second, the January 1990 IEP fails to specify strategies for adequately evaluating Cory's academic progress and determining which teaching methods are effective and which need to be revised. Although the IEP repeatedly incants the phrases, "daily work" and "unit tests," the routine practice of Cory's teacher last year was to mark mistakes in his work allowing Cory to correct these errors before grading him, and also to divide each end-of-unit test into smaller sections which she assigned to Cory separately. The court was presented with convincing expert testimony that such techniques cannot accurately gauge what material Cory has actually learned, in the sense of what he has mastered and retained rather than what he has simply committed to short term memory. *See* 20 U.S.C.A. § 1401(a)(19)(E) (IEP must include "evaluation procedures and schedules for determining ... whether instructional objectives are being achieved"); 34 C.F.R. § 300, Appendix C, paragraph 37 (IEP should "provide a mechanism for determining ... whether the child is progressing in the special education program [and] whether the placement and services are appropriate to the child's special learning needs").

Indeed, despite the constant, individual attention Cory has received from special education teachers, the results of a number of standardized tests administered to him in the last several years indicate that as of September 1990, he has made no substantial educational progress since 1987, before he began receiving special education. These test scores demonstrate that the instruction offered by the school board has done nothing to advance the principal purpose of providing special education to Cory, namely, to raise his abysmally low rate of learning.[33] The evidence also indicates

**30.** The court discusses the school board's failure to satisfy the mainstreaming requirement of the Act more extensively in Section II(B) of this opinion.

**31.** As Batsche tellingly pointed out, the only "self-contained" environments in the real·world are prisons and mental institutions.

**32.** The court considers Cory's current IEP to be the one adopted in January 1990 at an IEP meeting with Cory's mother. However, the academic portions of the "unofficial" IEP adopted by Cory's previous teacher in February 1990 and the one created by Cory's current teacher, *see* Defendant's Exhibit 3, are similar in many respects to the January 1990 document.

**33.** The school board cites the fact that Cory has received passing albeit poor classroom grades from his teachers at Dalraida in the second half of the 1989–90 school year and again in the first few weeks of the current school year. This does not indicate, however, that Cory performed the same work as other fifth-grade students who received similar grades. Indeed the face of each of his report cards reads: "Grades were earned in a special education program and represent below grade level performance." *See* Defendant's Exhibit 2. Moreover, as discussed previously, Cory's teacher routinely marked mistakes in his work and permitted him to correct them before receiving a grade, and also divided each end-of-unit test into smaller sections which she assigned him one at a time. In short, for these and other reasons, Knoff concluded—and the court agrees—that Cory's grades do not accurately reflect what he has learned, and that his standardized test scores are a more reliable indicator of the extent of his educational progress. *See Rowley*, 458 U.S. at 207 n. 28, 102 S.Ct. at 3034 (achievement of· passing marks and advancement from grade to

that Cory is unable to concentrate on school work unless he is personally supervised by a teacher and is prompted and instructed in small steps.

The court cannot agree with the school board's argument that because Cory has learned *something* in the last several years, he is therefore receiving an educational benefit from special education. These test results indicate that he would be in the same position he is now if he had never received any special education. Indeed, children learn *something* over the course of time simply from existing and watching television, even if they never attend a day of school. Under the Act, an educational benefit is not conferred anytime a student is not left to vegetate. The court agrees with the Third Circuit that the EHA cannot be so trivialized. "[T]he Act requires a plan of instruction under which educational *progress* is likely." *Bd. of Educ. of the East Windsor Regional Sch. Dist. v. Diamond*, 808 F.2d 987, 991 (3rd Cir.1986) (emphasis in original). "The Act ... requires a plan likely to produce progress, not retrogression or trivial educational advancement." *Id. Accord Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635–36 (4th Cir.1985) ("Clearly, Con-

gress did not intend that a school system could discharge its duty under the [Act] by providing a program that produces some minimal academic achievement, no matter how trivial").[34]

Applying this understanding of the Act's educational benefit requirement, the court must conclude that such a condition has not been satisfied by a generic educational program which offers no hope of improving Cory's stilted rate of learning; which trains him simply to swallow and promptly regurgitate correct answers rather than to master facts and ideas; which lacks a mechanism for evaluating and revising instructional strategies; and which does not seek to teach him to work independently as he would have to in a regular classroom.[35]

Moreover, after hearing expert testimony and other evidence regarding the methods, knowledge, and qualifications of Cory's present and past teachers as well as the board's special education supervisors, the court is concerned, as was the hearing officer, that these individuals may lack the expertise and training to implement an individualized program for Cory that would enable him to make educational progress.[36]

grade are important factors in determining educational benefit "When the handicapped child is being educated in the regular classrooms of a public school system"); *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir.1985) (child not receiving educational benefit despite promotions from grade to grade in light of test scores and independent evaluations); *Campbell v. Talladega Cty. Bd. of Educ.*, 518 F.Supp. 47, 53 (N.D.Ala.1981).

**34.** *See also Doe*, 915 F.2d at 665 (finding no EHA violation where program provided child with "more than de minimis educational benefits"); *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1158 (5th Cir.1986) ("the some-educational-benefit standard does not mean that the requirements of the Act are satisfied so long as a handicapped child's progress ... is not brought to a virtual standstill") (citation omitted); *Campbell v. Talladega Cty. Bd. of Educ.*, 518 F.Supp. 47, 54 (N.D.Ala. 1981).

**35.** The board argues that the Eleventh Circuit's recent decision in *Doe v. Alabama State Dep't of Educ.*, 915 F.2d 651 (11th Cir.1990), supports its contention that Cory is receiving educational benefits and, therefore, that it has met the requirements of the EHA. However, close exami-

nation of *Doe* indicates otherwise. *Doe* involved an emotionally handicapped student whose parents claimed his recent IEP's were not appropriate and that the child needed a residential placement. Applying a "clearly erroneous" standard of review, the court of appeals affirmed the determination by the district court—and the due process hearing officer—that the child was making sufficient educational progress. *Id.* at 666. More importantly, in contrast to this case, the district court in *Doe* had been presented with expert psychological and psychiatric testimony—including testimony by the child's treating physician—and other evidence that the child's educational programs "afforded substantial educational benefits," met his "psychological needs," and that a residential placement would be "inappropriate" and "counterproductive," having previously been tried and proven unsuccessful. *Id.* at 656, 665–66. Moreover, unlike Cory, the child in *Doe* was apparently making passing grades in regular rather than special education classes, and was also being provided with individualized psychological services. *Id.* at 656–57, 665–66.

**36.** Knoff and Batsche concluded that Cory's teachers and other special education staff involved in his education are inadequately

*See Drew P. v. Clarke Cty. Sch. Dist.,* 877 F.2d 927, 931 (11th Cir.1989) ("Although the board contends that the special educational programming afforded Drew was meaningful, individualized and provided under a small staff-to-student ratio by experienced professionals, there was ample evidence at trial to demonstrate that these professionals were untrained in the special needs of autistic children"). *See also Campbell v. Talladega Cty. Bd. of Educ.,* 518 F.Supp. 47, 56 (N.D.Ala.1981) (ordering school system officials to provide appropriate "training to [student's] teacher and to the special education coordinator" and suggesting that officials comply with order by requiring teacher and coordinator to attend "training program" conducted by handicapped student's expert).[37] However, the court cannot identify on the present record the nature or extent of these apparent deficiencies in training. Neither Cory's counsel nor his experts have pinpointed exactly what it is that is lacking in the abilities of the school system's personnel, and what specific measures which are reasonably available would remedy the problem.

#### ii. Behavior

There is ample evidence that Cory's emotional disability is primarily responsible for his academic problems. His inability to stay on task, to obey directions, or to avoid disrupting a class has obviously contributed significantly to Cory's learning difficulties. However, for several years school system officials ignored obvious signs suggesting that Cory suffered from a serious emotional disturbance, and even when they finally agreed he should be classified as emotionally conflicted, they failed, at least until February 1989, to develop *any* program for addressing his inappropriate behavior.

The system of behavioral control which Cory's teachers have implemented since that time has been woefully inadequate. The evidence reflects that school system officials have sought to keep Cory quiet and hidden away from other students, rather than attempting to teach him to control his own behavior, an essential approach to educating emotionally conflicted children.[38] The few behavioral "goals" contained in Cory's most recent IEP actually describe only general classroom rules and the punishments and rewards for breaking or following these rules, rather than any individualized strategies for changing Cory's behavior. In his testimony, Batsche stated categorically that such a generalized, "reinforcement" approach for coping with emotionally conflicted children was uniformly rejected by educators approximately ten years ago. According to Batsche, the only method for addressing the behavioral problems of such children that is currently accepted and whose results are proven is one which seeks to teach them the skills necessary for controlling their own conduct.[39] As Batsche explained, attempting to teach Cory appropriate behavior by means of reinforcement is comparable to trying to teach a child to swim by throwing him in the water and offering to reward him for not drowning. Furthermore, the absence of specific behavioral objectives in Cory's

---

trained, not only on the basis of their evaluation of Cory's educational situation, but also in light of interviews with his teachers, observations of their teaching methods, and an examination of the educational records they keep and the instructional materials they use.

37. Several portions of the EHA manifest Congress's concern that special education teachers and staff be adequately trained to work with handicapped children. *See* 20 U.S.C.A. § 1413(a)(3)(A)(ii) and (iii); § 1431(a) and (b).

38. The court was particularly disturbed by testimony from Cory's teacher during the last school year, who commented that Cory was often banished to a section of the room which was re-

ferred to in class as "Siberia." Congress was motivated to pass the EHA by studies which demonstrated that many handicapped children "were simply 'warehoused' in special classes or were neglectfully shepherded through the system until they were old enough to drop out." *Honig,* 484 U.S. at 309, 108 S.Ct. at 596 (citation omitted).

39. Batsche gave several examples of skill-building strategies. In one, the teacher engages the child in an exercise in which they reenact a teasing situation. Step-by-step, they discuss the child's feelings and reactions to the situation. Based on the teacher's instruction, the child then "models" alternative ways of responding, both mentally and verbally, to such teasing.

present or past IEP's makes it virtually impossible for special education personnel either to determine why and how Cory misbehaves or to evaluate whether particular educational strategies are actually having an impact on particular forms of misbehavior.[40] *See* 20 U.S.C.A. § 1401(a)(19)(B) and (E) (IEP must include "short-term instructional objectives" and "appropriate objective criteria and evaluation procedures and schedules for determining ... whether instructional objectives are being met"); 34 C.F.R. § 300 Appendix C, paragraph 39 ("Short term instructional objectives ... are measurable, intermediate steps").

Finally, school system officials have ignored another crucial component of a proper behavioral control program by failing to counsel and instruct Cory's parents in how to complement at home the training Cory receives at school.[41] It is well established that a "free appropriate public education" under the Act includes not only specially designed educational instruction, but also such related services "as are necessary to permit the child 'to benefit' from the instruction." *Rowley,* 458 U.S. at 189, 102 S.Ct. at 3042; 20 U.S.C.A. § 1401(17). The EHA defines "related services" broadly, and the federal regulations implementing the Act specifically include, among these services, "parent counseling and training," 34 C.F.R. § 300.13(a), which is defined as "assisting parents in understanding the special needs of their child and providing parents with information about child development." 34 C.F.R. § 300.13(b)(6).[42]

Cory's behavioral records confirm the experts' conclusions. While he has gone through periods of relative quiescence, his overall behavior has not improved and he has frequently become so abusive and disobedient that his teachers have had to remove him from the classroom and physically restrain him. Moreover, the evidence also indicates then when Cory does behave in class, it is only because a teacher or other adult is literally standing over him. Clearly such a dependency-building approach does nothing and in fact may make it more difficult to enable Cory to behave appropriately in a regular classroom or in the real world.

Thus, the court also finds that the school board is not providing Cory educational benefit because its programs do not address the behavioral problems that hinder his learning.[43] Moreover, as in the area of Cory's academic instruction, the court notes its concern that the teachers and staff who are involved in Cory's education may lack the expertise and training necessary to provide him with a minimally adequate program of behavioral control. *See Drew,* 877 F.2d at 931; *Campbell,* 518 F.Supp. at 56. Again, however, Cory's parents have not pinpointed what is lacking in the personnel's training and what needs to be done to remedy the deficiency.

### B. Least Restrictive Environment

The school board's current program for educating Cory is also legally inadequate because it violates the Act's requirement that disabled children be "mainstreamed"

---

**40.** As one example of a specific behavioral objective, Knoff suggested that Cory's IEP might aim to enable him to demonstrate appropriate in-seat behavior 85% of the time over a two-week period in situations in which other students tease him. Such an objective might be based on the hypothesis that one reason Cory refuses to stay in his seat is because of such teasing. In order to evaluate whether this hypothesis is correct or whether this objective is being satisfied, Cory's teacher would have to observe him in order to determine how many times he leaves his seat during this period and how often he does so because of teasing.

**41.** The school board has suggested that mental health and other counseling services are available to Cory's family from agencies in the community. However, the Act requires that school

officials themselves arrange to provide necessary "related services" to a handicapped child, and that the IEP describe the services to be offered. *See* 34 C.F.R. § 300, Appendix C, paragraphs 44–45.

**42.** Other sections of the Act also demonstrate that Congress intended that parents of handicapped children have access to training and information. *See, e.g.,* 20 U.S.C.A. § 1431(c).

**43.** *Compare Doe,* 915 F.2d at 665–66 (denying parents' EHA claim that manic-depressive child needed residential placement where evidence showed proposed public school program met child's "psychological needs," and several experts testified residential facility would be "counterproductive," and "inappropriate" for child). *See also* note 35, *supra.*

or educated in the "least restrictive environment." *Martinez v. Sch. Bd. of Hillsborough Cty.*, 861 F.2d 1502, 1505 (11th Cir.1988). School officials must make use of those "supplementary aids and services" which may enable a child to attend classes with non-handicapped students, rather than segregate him in a special education classroom. 20 U.S.C.A. § 1412(5). School districts have a "broad" obligation to modify and add to regular education in order to accommodate handicapped students. *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir.1989).

Cory's current educational program violates this requirement because it offers him no realistic prospect of returning to the regular class setting, which, of course, would be the least restrictive environment for any student. *Compare Daniel R.R.*, 874 F.2d at 1051 (particular educational decision appropriate because it "may help to prepare Daniel for regular education *in the future*") (emphasis added). *See also Chris D. v. Montgomery Cty. Bd. of Educ.*, 743 F.Supp. 1524, 1530 (M.D.Ala. 1990). Until Cory learns to control his own behavior and work somewhat independently, he cannot be placed in a junior high school classroom with students approximately his own age. However, his present IEP and the educational methods used by special education teachers and staff at Dalraida do not provide any opportunity for Cory to learn behavior control skills or to complete his school work without constant prompting and supervision. According to expert testimony, an appropriate educational program implemented now would likely enable Cory to enter successfully a regular junior high school classroom some time during the next school year.

Moreover, because of Cory's relatively advanced age, it is crucial that school officials immediately initiate a program that promises to enable Cory to be mainstreamed as soon as possible. Most students Cory's age are now enrolled in the seventh grade. There are no self-contained classrooms for emotionally conflicted students in any of the system's junior high schools, although there are resource rooms where such students can receive additional assistance each day. Cory's only other placement option for next year would be the Davis Learning Center, where most if not all of the other students are significantly younger than he. Experts testified that it is essential for Cory to be exposed to students his own age in order to learn to behave properly and work independently. *See Campbell v. Talladega Cty. Bd. of Educ.*, 518 F.Supp. 47, 55 (N.D.Ala.1981) ("considerable evidence established that interaction [by handicapped plaintiff with non-handicapped students] is essential to provide him with role models and to increase his ability to act independently"). In addition, as Cory grows older and stronger, his violent outbursts will undoubtedly become more serious and adults will find it more difficult to physically restrain him.

Thus, the court concludes that Cory's current educational program violates both the "educational benefit" and "least restrictive environment" requirements of the EHA.[44] The court, therefore, must determine what relief is appropriate.

## III. RELIEF

As discussed previously, the current efforts of school system officials to develop and implement an educational program for Cory are flawed in at least two principal respects: first, Cory's current IEP does not include sufficiently specific behavioral or academic goals, or methods for evaluating Cory's progress; and second, officials have not provided counseling or training to Cory's parents or adequately involved them in efforts to teach Cory or control his behavior. Cory's parents presented claims regarding both these matters to the hearing officer. Although the officer ordered an independent evaluation of Cory to be conducted, he did not grant their specific

**44.** Because Cory is entitled to relief under the EHA, the court finds it unnecessary to resolve his claim under § 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. § 794. The Rehabilitation Act provides no more and possibly less support than the EHA for Cory's challenge to his educational program. *See* 34 C.F.R. §§ 104.-3(k)(2)(iii), 104.33; *Doe,* 915 F.2d at 666.

requests that the board implement a new IEP developed by an independent expert of their choice and that the board provide parent counseling and training.

Since the due process hearing, the board has consented to pay Knoff to formulate a new IEP, but has not agreed to adopt it or consented to the other relief requested by Cory's parents. The court now finds that such relief is necessary to remedy the precise defects in Cory's educational program which deny him his rights under the educational benefit and mainstreaming provisions of the EHA. Cory is entitled to, and in immediate need of, an IEP which meets the requirements of the EHA. The court has examined the new IEP that Knoff has written and submitted for Cory, and finds that it contains the necessary specific, individualized goals and methods in the areas of both academics and behavior that have been conspicuously absent from previous educational programs adopted for Cory by school system officials. Under these urgent circumstances, the court will require that the board adopt this IEP for Cory. Moreover, to make the IEP work, the board must also develop and implement as soon as possible a plan to provide Cory's parents with appropriate counseling and training.

Cory's parents have also argued both to the hearing officer and the court that the board's special education teachers and staff lack the expertise and training to put into practice an IEP for Cory that would enable him to make educational progress, and have accordingly asked that the board be ordered to provide these personnel with supplemental training. Although, as indicated earlier, the court is inclined to agree, it cannot on the present record identify the nature or extent of any deficiency in training. Moreover, because Cory's parents have not pinpointed exactly what needs to be done to remedy the problem, the court cannot tailor any necessary relief. The court will, therefore, set this issue for hearing at a later date, after the parties have had an opportunity to investigate it further and develop a more adequate record.

The school board correctly points out that the EHA does not require a school district to maximize the educational benefit provided to a disabled student, but rather, simply requires a "basic floor of opportunity." *Rowley*, 458 U.S. at 199, 102 S.Ct. at 3047; *Doe*, 915 F.2d at 665. However, the expert testimony in this case has demonstrated that, as in *Drew*, the corrective actions ordered by the court represent "a necessity rather than an optimum situation" for Cory. *Drew*, 877 F.2d at 930 n. 4. *See also Diamond*, 808 F.2d at 992, *quoting Bd. of Educ. of the East Windsor Regional Sch. Dist. v. Diamond* No. 83–2364, at 12–13 (D.N.J. Oct. 4, 1985) ("[i]f, incidentally, that program does in fact 'maximize' his potential, so much the better; however, this Court has not measured the inadequacy of [the school board's] plan against any maximization standard. That plan fails because of its failure to meet the express requirements of EHA itself"). *See also Chris D.*, 743 F.Supp. at 1531.

Nor has the court been unfaithful to the Supreme Court's directive that "courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051.[45] Cory's EHA claim has not presented a battle of experts, in which a court must choose between competent expert testimony presented by opposing parties. Here, the school board has presented no credible expert testimony in support of Cory's current educational program.[46] *Compare Doe*, 915 F.2d at 666 (relying on expert testimony that resi-

---

**45.** The Supreme Court has instructed that, even though the Act authorizes courts to make their decisions based on a "preponderance of the evidence" and to "grant such relief as the court determines is appropriate," 20 U.S.C.A. § 1415(e)(2), courts should give substantial deference to the decisions of state administrative hearing officers if the Act's procedural requirements have been followed. *Rowley*, 458 U.S. at 205–07, 102 S.Ct. at 3050–51. In this case, the court does not depart significantly from the findings of the hearing officer in determining liability. The hearing officer found that the school board was not providing Cory a free, appropriate public education under the EHA. Hearing Decision of December 20, 1989, at 9.

**46.** *See* note 28, *supra*.

dential placement requested by child's parents would be "counterproductive to his development"). *See also Chris D.*, 743 F.Supp. at 1531–32. Cory's parents, in contrast, have presented substantial expert testimony in support of their contentions that this program is not providing Cory an educational benefit and that a new IEP along with related counseling and training services is the only appropriate choice under the EHA.

## IV. CONCLUSION

Having carefully considered the evidence presented by both parties, the court concludes that the board must adopt and implement the IEP written by Dr. Howard Knoff, and must also provide counseling and training for Cory's parents. The board should work with Cory's parents and their attorneys in developing a parent counseling program as well as in implementing and, as will certainly be necessary in the future, revising Cory's new IEP. Finally, the court will set for resolution at a later time the issue of the possible need for teachers and staff to receive further professional training.

An appropriate judgment will be entered in accordance with this opinion.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment be and it is hereby entered in favor of plaintiff Cory M. and against defendants Montgomery County Board of Education, its Superintendent, and its Special Education Coordinator;

(2) That defendants Montgomery County Board of Education, its Superintendent, its Special Education Coordinator, and their officers, agents, servants, and employees and those persons in active concert or participation with them who receive actual notice of this order, be and they are hereby ENJOINED and RESTRAINED from failing forthwith to implement the new "Individualized Educational Program" formulated by Dr. Howard Knoff;

(3) That defendants Montgomery County Board of Education, its Superintendent, and its Special Coordinator shall, within 30 days of the date of this order, develop and implement in conjunction with Cory M.'s parents and their attorneys a plan for providing counseling and training to his parents, as described in the memorandum opinion; and

(4) That the issue of whether defendants' special education personnel are adequately trained to implement Cory's new "Individualized Educational Program" is set for a status conference on January 3, 1991, at 4:00 p.m. at the federal courthouse in Montgomery, Alabama.

It is further ORDERED that plaintiff Cory M. is allowed until the completion of all claims in this litigation to file any request for attorney's fees, expenses, and costs.